THE INDEMNITY MARINE ASSURANCE COMPANY, LTD v
LIPIN ROBINSON WAREHOUSE CORPORATION

Docket No. 44268. Submitted March 4, 1980, at Detroit.—Decided
July 23, 1980.

The Indemnity Marine Assurance Company, Ltd., as subrogee of
Combi-Camp of America, Inc., and Combi-Camp of America,
Inc., brought suit against defendant Lipin Robinson Warehouse
Corp., for damages for its improper storage and handling of
plaintiff Combi-Camp's goods. Wayne Circuit Court, Roland L.
Olzark, J., awarded damages of $4,761.85. Plaintiffs appeal the
court's determination of damages. *Held:*

1. The trial court did not err in refusing to award damages
for lost profits, since plaintiffs failed to establish with reason-
able certainty their entitlement to such an award.

2. The trial court's finding that insufficient evidence was
adduced to hold defendants liable for damages concerning units
sold to certain individuals was not clearly erroneous, and, thus,
shall not be set aside.

3. The trial court's findings that insufficient evidence was
adduced to hold defendants responsible for costs of repair of
certain units was clearly erroneous, and plaintiffs are entitled
to additional damages of $1,851.30.

Judgment modified.

1. BAILMENTS — DELIVERY OF GOODS — DISPOSAL OF GOODS — TITLE.

Goods delivered to a party without passing title to be disposed of
in accordance with the orders of the title holder constitute a
paradigm of a bailment.

2. STATUTES — WAREHOUSE RECEIPTS — UNIFORM COMMERCIAL CODE
— SCOPE.

The scope of Article 7 of the Uniform Commercial Code can be

REFERENCES FOR POINTS IN HEADNOTES
[1] 8 Am Jur 2d, Bailments § 2.
[2] 15 Am Jur 2d, Commercial Code § 17 *et seq.*
    73 Am Jur 2d, Statutes § 94.
[3] 78 Am Jur 2d, Warehouses § 267.
[4] 8 Am Jur 2d, Bailments § 346.
[5] 5 Am Jur 2d, Appeal and Error § 882.

said to be determined by its individual provisions since it does not include one basic provision outlining its scope (MCL 440.7101 *et seq.;* MSA 19.7101 *et seq.).*

3. STATUTES — WAREHOUSEMEN — LOST PROFITS — CONSEQUENTIAL DAMAGES.
   Pursuant to statute, warehousemen may be liable for lost profits as an element of consequential damages in appropriate cases (MCL 440.7204[1]; MSA 19.7204[1]).

4. BAILMENTS — BREACH OF CONTRACT — NOTICE TO BAILEE — NATURE OF ITEMS ENTRUSTED — LOST PROFITS — DAMAGES.
   A bailee must be fully apprised of the fact that the items entrusted to his care are for resale and could not otherwise be procured in the market for projected profits to be included as a loss item in a suit for a breach of a bailment contract, and such profits must be reasonably certain and not unduly speculative.

5. EVIDENCE — STANDARD OF REVIEW — APPEAL — SUFFICIENCY — PLAIN ERROR — MISTAKE.
   The standard of review on appeal from a trial court's verdict, wherein the sufficiency of evidence in support thereof is challenged, is that findings of fact shall not be set aside unless clearly erroneous; *i.e.,* that although there is evidence to support the finding, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed.

*Bushnell, Gage, Reizen & Byington* (by *William A. Roy),* for plaintiffs.

*Goldsmith, Yaker & Goldsmith,* for defendants.

Before: D. E. HOLBROOK, JR., P.J., and R. M. MAHER and CYNAR, JJ.

CYNAR, J. On June 19, 1974, The Indemnity Marine Assurance Company, Ltd., as subrogee of Combi-Camp of America, and Combi-Camp of America sued defendant Lipin Robinson Warehouse Corporation for damages arising out of the latter's improper storage and handling of Combi-Camp's goods. Following a bench trial, plaintiffs

were awarded $4,761.85 in damages. Plaintiffs appeal as of right the trial court's determination of damages.

James O'Brien was the first witness to testify. He stated that he was a self-employed manufacturing agent. While in the course of his employment he represented Tilley Manufacturing Company. In May, 1973, he sold 14 and 16 foot canoes manufactured by Tilley to Combi-Camp. Said canoes were improperly shipped and were damaged. Thus O'Brien went to inspect the canoes at Lipin Robinson Warehouse. The canoes were randomly stacked on campers which were stored on end, in an upright position. Approximately 112 canoes were being stored. Mr. Lipin, of defendant company, allocated space behind the Combi campers as a work area. The canoes were brought down from the campers with the aid of a forklift truck. People from Tilley Manufacturing walked across the campers to put the canoes on the forklift. The workmen wore shoes with high heels. Later, a third person told Mr. Lipin and Mr. O'Brien that the guys walking on the campers would damage them. However, Mr. Lipin indicated that somebody from Combi-Camp told him it was all right.

Samuel Goldfarb, former president of Combi-Camp of America, also testified. Combi-Camp was a wholesaler for Danish Camping Trailers. Mr. Goldfarb stated that each unit was shipped in a "seatrained" container to the United States. These are large, watertight storage boxes. There were three different Combi-Camp models. Two models, the regular and deluxe, were sold to dealers for $695. A stripped down model sold to dealers for $575 east of the Mississippi and $495 west of the Mississippi. Distributors paid $550 and $570 for the regular and deluxe models and $350 or $370 for the stripped down model.

Mr. Goldfarb indicated that Lipin Robinson Warehouse charged him a higher rate for storage because the campers required careful handling and because no products could be stored on top of the campers. Mr. Goldfarb then identified a series of photos showing improper storage or damage to Combi-Camp units. Some units were stacked on top of each other instead of vertically. The Lipin Robinson Warehouse employees unloaded the campers and charged for this service.

There was a proper procedure for unloading the crates which Mr. Goldfarb had discussed with Bob Lipin. Nothing could be stored on top of the campers because the front ends were made of fiberglass. This had been discussed with warehouse employees.

Customers had begun to complain about front end damage to the campers. The front end of the camper was the part which pointed toward the ceiling of the warehouse. Center panels and corners were reported crushed. Mr. Goldfarb did not give permission to Bob Lipin to store damaged canoes on the campers. He was never informed that this was being done, although he ultimately saw them so stored during a periodic check of the warehouse. Mr. Goldfarb vigorously protested this storing method to defendant. The witness personally observed two men with high-heeled shoes walking on the campers. Mr. Goldfarb complained, "ranted, raved, and armwaved", about this situation. Mr. Lipin did nothing. Even after the canoes were removed from the warehouse, the men continued to walk on the campers. Campers were removed from the warehouse to be sold to a customer in Toronto. At this time, many damaged units were uncovered. When Mr. Goldfarb complained to Mr. Robinson, the latter stated that "he

was going to throw them in the center of the expressway and forget the whole damned mess".

Robert Lipin was called as an adverse witness by the plaintiff. He stated that he was vice-president and general manager of Lipin Robinson Warehouse. When the deal with Combi-Camp was in effect, Mr. Lipin was the warehouse manager. He was responsible for the daily handling of the Combi campers. Mr. Lipin admitted that he had seen his warehouse employees walking on top of the Combi campers. However, almost every shipment of Combi campers had some kind of damage done to the units. Lipin stated that there was a spot on the Combi campers where a person could step without damaging them. However, he also admitted that even being careful in the right spot a person's foot would probably be on some fiberglass. Mr. Lipin denied that he had ever given any instructions concerning where to walk on the campers to the repairmen from Tilley Manufacturing who came to work on the canoes. Mr. Lipin stated that when Mr. Goldfarb protested the repairmen's walking on the campers, he ordered them down. Mr. Lipin further disputed that Mr. Goldfarb had complained that the canoes were being stored on the campers. Furthermore, another agent of Combi-Camp, George Nickerson, told Mr. Lipin that it was alright to walk on the campers. However, Mr. Nickerson never said it was okay to walk on the fiberglass.

George Nickerson also testified on behalf of plaintiff Combi-Camp and stated that when he worked for Combi-Camp he delivered and repaired campers. Mr. Nickerson also saw two workmen at the warehouse walking on the campers. He told them not to walk there, but the workers ignored him. The witness repaired and picked up campers

with damaged front and side panels in Columbus, Ohio, and in Texas.

On cross-examination, Mr. Nickerson stated that he knew that the damaged campers he repaired in Texas were from the Lipin Robinson Warehouse. Mr. Nickerson showed Robert Lipin how to "walk" across the campers. However, he stated that he never gave anybody permission to walk on them. To check serial numbers, however, some stepping on the campers was necessary. Mr. Nickerson further contended that he told Mr. Lipin to crawl across the trailers. Finally, he stated that trailers with front panel damage still had value and were not abandoned.

Plaintiffs appeal by right the above-noted award of damages, raising three questions for this Court to review.

*I. Did the trial court err in refusing to award damages for lost profits on the original sale of the campers, irrespective of whether the units were later resold?*

Both parties' arguments are predicated on the premise that Article 2 of the Uniform Commercial Code (UCC) applies to this case. In fact, this premise is faulty. Article 2 is concerned with transactions in goods. The Article 2 statutory provision cited by both parties, MCL 440.2708; MSA 19.2708, pertains to a seller's damages for nonacceptance or repudiation by a buyer. In the instant case, the defendants are simply not buyers. There was no contract of sale between Combi-Camp and Lipin Robinson Warehouse. Combi-Camp was not selling campers to Lipin Robinson nor was Lipin Robinson a buyer of campers. See MCL 440.2103(1); MSA 19.2103(1).

In actuality, a bailment was created between Combi-Camp and Lipin Robinson. Combi-Camp de-

livered goods to defendant, without passing title, to be disposed of in accordance with Combi-Camp's orders, the paradigm of a bailment. *In re George L Nadell & Co, Inc,* 294 Mich 150, 154; 292 NW 684 (1940), 4 Michigan Law & Practice, Bailments, § 1, p 38. The question to be decided, then, is what is the measure of damages where a bailee has negligently stored and handled the bailor's goods which are intended for ultimate resale at a profit.

First, it must be decided whether this question should be answered with reference to Article 7 of the UCC or under the common law of bailments. The title appended to Article 7 is "Warehouse Receipts, Bills of Lading and Other Documents of Title". In the instant case, the record is unclear whether warehouse receipts or other documents were issued by Lipin Robinson Warehouse indicating ownership of the goods. Mr. Goldfarb's testimony suggests, however, that Lipin Robinson Warehouse Corporation did issue warehouse receipts as defined in MCL 440.1201(45); MSA 19.1201(45). Since Lipin Robinson was in the warehousing business, one would expect the issuance of such documents. Certainly Combi-Camp received some documents from Lipin Robinson.

The issuance of warehouse receipts or other documents of title by Lipin Robinson is not, in any event, critical to a finding that Article 7 of the UCC applies. While most of the provisions of Article 7 specifically deal with such documents, they are not mentioned in every provision. It is undeniable that Lipin Robinson is a "warehouseman" as defined by MCL 440.7102(1)(h); MSA 19.7102(1)(h). Unlike other major articles of the code, Article 7 *does not* include one basic provision outlining its scope. Thus, its scope can be said to be determined by its individual provisions. MCL 440.7204(1); MSA 19.7204(1) provides:

"A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care."

It would seem that whether or not warehouse receipts were issued by Lipin Robinson, this provision would be applicable in the instant case. It has already been noted that Lipin Robinson is a "warehouseman" as that term is defined in Article 7. Thus, we conclude that the above article applies in the instant case.

MCL 440.7204(1); MSA 19.7204(1) speaks of a warehouseman's liability for "damages for loss of or injury to goods". This language does not expressly allow for the recovery of lost profits in the form of consequential damages. Since other remedy provisions in the code specifically allow for lost profits (i.e., MCL 440.2708; MSA 19.2708) or consequential damages (i.e., MCL 440.2714; MSA 19.2714), this fact cuts against finding that lost profits are properly included as an item in the plaintiff's recovery under Article 7. This, in part, accounts for plaintiff's reliance on the Article 2 damage provisions in seeking an award of lost profits, the argument being that an award for lost profits is necessary here to make plaintiff whole and is not recoverable under Article 7, therefore necessitating resort to Article 2 remedies to afford plaintiff complete relief. Such a restrictive view of the nature of damages recoverable under Article 7 is not, in our view, the correct one.

Uniform Commercial Code authorities James J. White and Robert S. Summers argue that in appropriate cases UCC § 7-204(1) should be construed to cover lost profits as consequential damages.

White and Summers, Uniform Commercial Code (1st ed), § 20-3, pp 676-677. We agree with this proposition.

However, the example presented in their treatise is premised on the ability of the plaintiff to prove that only an award of lost profits can make him whole. In this respect, an award of lost profits in a bailment context is no different under the common law or the code.

No Michigan cases exist which are precisely on point with the instant situation. However, case law from other jurisdictions suggests the lost profits are rarely an appropriate item of damages in a bailment situation. The cases indicate that, for profits to be included as a loss item in a bailment contract, the bailee must have been fully apprised of the fact that the items were for resale and that the goods could not otherwise be procured in the market. Furthermore, the projected lost profits must be reasonably certain and not unduly speculative. See *Groendyke Transport, Inc v Merchant,* 380 P2d 682 (Okla, 1962), *Lowes Glove Co, Inc v Acme Fast Freight, Inc,* 54 Misc 2d 429; 282 NYS2d 869 (1967), *California Eastern Airways, Inc v Alaska Airlines, Inc,* 38 Wash 2d 378; 229 P2d 540 (1951), *Greenberg Bothers, Inc v Ernest W Hahn, Inc,* 246 Cal App 2d 529; 54 Cal Rptr 770 (1966). Only in *Groendyke, supra,* were lost profits actually upheld as a loss item in the judgment.

In other contractual situations, Michigan follows the general rule regarding reasonable certainty and no undue speculation in projections of lost profits. *Fera v Village Plaza, Inc,* 396 Mich 639; 242 NW2d 372 (1976), *Fabbrini Family Foods, Inc v United Canning Corp,* 90 Mich App 80; 280 NW2d 877 (1979), *lv den* 407 Mich 956 (1980). Under this general rule, we are constrained to

conclude that the trial court properly refused to make an award for lost profits, specifically finding that lost profits were highly speculative in this action.

The evidence showed that Combi-Camp had never been particularly profitable. In its first year of business Combi-Camp sustained a loss of some $4,500. In its second year of operation, an unaudited profit of approximately $55,000 was obtained. There was no showing by Combi-Camp that it could have sold more trailers had the damages not occurred. At no time did any Combi-Camp representative state that its supply of campers was inadequate to meet demand because of Lipin Robinson Warehouse's negligence. Nor was there any evidence concerning fixed overhead expenses submitted by the plaintiffs. The "lost" profits were determined solely by subtracting unit cost to Combi-Camp from unit selling price by Combi-Camp.

Assuming that the common law analysis regarding lost profits, engaged in above, is equally applicable to an Article 7 claim for lost profits, we hold that plaintiffs have failed to establish with reasonable certainty their entitlement to such an award under Article 7.

Similarly, since plaintiffs are unable to show which variable overhead costs are attributable to which particular trailer unit, they are not entitled to an award for such variable overhead costs, even granting that such recovery is envisioned by MCL 440.7204(1); MSA 19.7204(1).[1]

---

[1] Such an award is arguably permissible under MCL 440.2708(2); MSA 19.2708(2). See Childres & Burgess, *Sellers' Remedies: The Primacy of UCC 2-708(2)*, 48 NYU L Rev 833 (1973). Whether MCL 440.7204(1) also allows for such recovery is a question we need not answer at this time, given plaintiffs' failure to surmount the threshold obstacle of attributing variable costs to specific units.

II. *Was the trial court's finding that insufficient evidence was adduced to hold the defendants liable for damages concerning the units sold to Kay Penson and Werk Motors erroneous?*

Plaintiffs contend that the trial court erred in not awarding damages for seven Combi-Camp trailers—six which were returned by Werk Motors and one which was not sold to Kay Penson.

The standard of review on appeal from a trial court's verdict, wherein the sufficiency of the evidence in support thereof is challenged, is set forth in GCR 1963, 517.1, which provides in relevant part:

"In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the fact specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. * * * Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it."

A finding of fact is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed". *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

With respect to the six Werk Motors units, we find that the court was in error in finding that no testimony was heard as to the nature of the damage. Testimony was given which established front panel damage to these units. However, the court's later finding that sufficient proof that defendant caused the panel damage was not adduced was not clearly erroneous. There was no testimony estab-

lishing a causal nexus between the damage and acts or omissions of defendant, either directly or inferentially. This latter conclusion is equally applicable to the Kay Penson unit. Accordingly, the trial court's denial of an award relative to these units is affirmed.

III. *Were the trial court's findings that insufficient evidence was adduced to hold the defendants responsible for repair costs with respect to certain Combi-Camp units erroneous?*

The standard of review when considering claims concerning the trial court's factual findings is discussed in Issue II, *supra.*

Plaintiffs first contend that they are entitled to $544.50, representing a repair cost of $54.45 per unit for ten units shipped to Southwest Combi-Camp for replacement of damaged front panels. The trial court found that there was no proof indicating that plaintiff Combi-Camp actually paid for the repairs.

We disagree. There was testimony from Mr. Goldfarb which indicated that Combi-Camp supplied the ten needed replacement panels to Southwest Combi-Camp, which performed the labor required for installation thereof. The cost per panel, absorbed by plaintiff Combi-Camp, was $54.45. Thus, with respect to these ten units, plaintiffs are entitled to an additional $544.50 in damages.

We also find to be clearly erroneous the trial court's finding that there was insufficient proof of damage with respect to 12 units sold to Rolling Homes, a finding that is curious in that the court found that defendant caused front panel damage to these units, yet denied recovery of any amount therefor. Again, uncontroverted testimony established that Combi-Camp supplied replacement panels for each of these units at a cost to it of $54.45

per panel, the labor being performed without charge by Southwest Combi-Camp. Accordingly, plaintiffs are entitled to an additional $653.40 in damages relative to these damaged units.

Finally, plaintiffs seek an additional $653.40 in damages in respect to twelve units sold to Southwest Combi-Camp. Again, the trial court found that defendant caused the damage, yet found that there was no showing that plaintiff paid for the costs of repair. This latter finding was clearly erroneous, for Mr. Goldfarb testified that plaintiff supplied twelve panels to Southwest for repairs at a cost to it of $54.45 per panel. Therefore, plaintiffs were entitled to the $653.40 additional damages they seek in this instance.

In summary, we find that plaintiffs are entitled to an additional $1,851.30 in damages. Thus, we conclude that the judgment of the trial court should be modified to reflect this increased award and order entry of judgment in accordance with this opinion pursuant to GCR 1963, 820.1(7).