In the Matter of the CELOTEX
CORPORATION, et al.,
Debtor(s).

Bankruptcy Nos. 90–10016–
8B1, 90–10017–8B1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 26, 1991.

See also 128 B.R. 478.

Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, Fla., for The Celotex Corp., et al.

Jeanne B. Blumenthal, Eichorn, Eichorn & Link, Hammond, Ind., Jay B. Verona, Stolba, Verona & McEwen, St. Petersburg, Fla., for Northern Indiana Public Service Co.

Sara Kistler, Asst. U.S. Trustee.

John W. Kozyak, Kozyak Tropin Throckmorton & Humphreys, P.A., Miami, Fla., for Asbestos Property Damage Claimants Committee.

Charles M. Tatelbaum, Johnson, Blakely, Pope, Boker, Ruppel & Burns, P.A., Tampa, Fla., for Creditors Committee of Unsecured Creditors.

William Knight Zewadski, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for Unofficial Asbestos Health Claim co-defendants Committee.

M. Elizabeth Wall, Honigman Miller Schwartz and Cohn, Tampa, Fla., for Asbestos Health Claimants Committee.

ORDER ON NORTHERN INDIANA PUBLIC SERVICE COMPANY'S AMENDED MOTION FOR RELIEF FROM AUTOMATIC STAY

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

THIS CAUSE came on for final evidentiary hearing upon Northern Indiana Public

Service Company's Amended Motion for Relief from Automatic Stay. Northern Indiana Public Service Company (Northern Indiana) claims liens established through its activities as a warehouseman, a common carrier, and an artisan against 196,800 therms of natural gas provided to Debtor.

## STIPULATED FACTS

The parties have stipulated the following facts:

1. NIPSCO Industries, Inc., an Indiana corporation doing business as a utility holding company, is the parent and sole shareholder of Northern Indiana, a gas and electric utility company; NIPSCO Energy Services, Inc. (NESI), an energy services business; and NIPSCO Energy Trading Corp. (NETCO), an energy brokerage service business.

2. Debtor operates an acoustical ceiling tile plant located in Lagro, Indiana. This plant consumes approximately 2,658,000 therms of natural gas per year.

3. Debtor arranges for purchase of its natural gas through NETCO or other natural gas brokers in lieu of making purchases from Northern Indiana, the local utility company. By purchasing natural gas through brokers whenever possible, Debtor saves considerable money each year in energy costs. All the natural gas Debtor purchases for use at the Lagro plant is transported to the plant through the transportation system owned by Northern Indiana. The natural gas is either consumed or stored in Northern Indiana's underground storage field. Natural gas purchased and transported in this manner is commonly referred to as "self-help" gas.

4. Northern Indiana provides services to customers in the northern third of Indiana which includes Debtor's ceiling tile plant in Lagro, Indiana. Northern Indiana provided its gas sales service to Debtor at all times relevant to this dispute.

5. Northern Indiana provided transportation services for Debtor's self-help gas under Rate 228 pursuant to the Contract for Gas Service, dated March 4, 1987. The rate applicable to transportation services was renumbered 328 on October 13, 1990.

6. On July 26, 1988, NESI contracted with Debtor for NESI to act as Debtor's purchasing agent to obtain volumes of self-help gas and arrange for transportation and delivery of such volumes of gas to Northern Indiana's gas distribution system for ultimate redelivery to Debtor at its Lagro plant. In April 1989 NESI assigned its rights under the contract to its sister corporation, NETCO.

7. Northern Indiana provided gas storage service under Rate 340 pursuant to the Contract for Gas Service—Experimental Best Efforts Storage Service, dated June 1, 1989 (the Storage Contract). The gas stored pursuant to the Storage Contract is known as "BESS" gas.

8. The rate schedules applicable to the contracts specified in paragraphs 5 and 7, above, were filed with and approved by the Indiana Utility Regulatory Commission.

9. Pursuant to the Storage Contract, Debtor arranged for the delivery of a specified maximum amount of natural gas to Northern Indiana City Gate for storage by Northern Indiana until Debtor ordered redelivery to the Lagro plant.

10. Before Debtor filed its Chapter 11 petition, it had purchased from brokers and placed in storage with Northern Indiana a total of 196,800 therms of BESS gas for use at the Lagro plant.

11. Northern Indiana did not issue any document entitled "Warehouse Receipt" covering the BESS gas; however, Northern Indiana contends that certain documents it did issue constitute a valid warehouse receipt. This documentation, describing the natural gas and identifying 196,800 therms of BESS gas belonging to Debtor, was issued to Debtor by Northern Indiana in the form of monthly service statements or invoices for services rendered.

12. A document which described the final injection of Debtor's BESS gas was issued by NIPSCO through its authorized agent, George Gandolfo, and identified 196,800 therms of natural gas as belonging to Debtor.

13. Debtor received at its Lagro plant each of the documents described in paragraphs 11 and 12, above, on or before October 12, 1990, the date Debtor filed its petition for relief under the Bankruptcy Code.

14. While BESS gas was transported and stored for ultimate redelivery to Debtor's Lagro facility, Northern Indiana also performed services for which it was to be paid under Rates 328 and 340 with respect to the gas; specifically, it maintained the gas at a constant pressure and temperature, injected odorant into it, and maintained a specified mix of its chemical components by measuring, testing and altering the subject gas as necessary to maintain its heating value and purity.

15. On October 12, 1990, Northern Indiana was obligated to deliver, upon Debtor's order, 196,800 therms of natural gas which had a value of $34,817.86 based on the spot market prices for natural gas in October 1990.

16. On October 12, 1990, Debtor owed Northern Indiana $1,294.15 for Rate 340 services and $24,592.58 for Rate 328[1] services for a total of $25,786.13.[2]

17. Debtor asked for redelivery of the 196,800 therms of BESS gas, and Northern Indiana refused to redeliver. Since October 12, 1990, when Debtor filed for relief under the Bankruptcy Code, Northern Indiana has continued to hold Debtor's BESS gas which Debtor had purchased and caused to be delivered to Northern Indiana's storage facility.

## GENERAL LEGAL CONCEPTS ASSOCIATED WITH WAREHOUSEMAN'S LIENS

■ While for most, the law of warehouseman's liens is a fleeting shadow of earlier years of legal education, there is a symmetry to the law which is apparent and establishes prerequisites for the creation of liens while at the same time promoting usage of the trade. In order to be entitled to a warehouseman's lien, the party asserting the lien must be defined as a warehouseman. Such a definition is well recognized: a party in the business of storing goods for hire. *See Indemnity Marine Assurance Co. v. Lipin Robinson Warehouse Corp.*, 99 Mich.App. 6, 297 N.W.2d 846 (1980); *Dathar Corp. v. Lemkin,* 14 U.C.C.Rep.Serv. (Callaghan) 1207 (N.Y.Sup. Ct.1974).

■ Once qualified as a warehouseman, in order to acquire a lien the warehouseman must issue a document known as a warehouse receipt. The receipt is a condition precedent to establishing a lien on the goods in the possession of the warehouseman. Under the Uniform Commercial Code, the warehouse receipt is a document of title. U.C.C. § 1–201(15); Ind. Code § 26–1–1–201(15). Therefore, the warehouse receipt must be in writing, arise out of the normal course of business of the warehouseman and evidence the person in possession of the receipt is entitled to receive and dispose of the document and the goods it covers. *See* William D. Hawkland et al., Uniform Commercial Code Series § 7–202:01 (1986).

■ While the law is quite clear the warehouse receipt need not be in any particular form (*Kearns v. McNeill Brothers Moving and Storage,* 509 A.2d 1132 (D.C.1986)) in order to create a lien, there are requirements under various commercial laws that the receipt contain certain information.

Section 26–1–7–202 of the Indiana Code[3] provides:

(1) A warehouse receipt need not be in any particular form.

(2) Unless a warehouse receipt embodies within its written or printed terms each

---

**1.** Although the parties have stipulated that as of October 12, 1990, Debtor owed Northern Indiana $24,592.58 for Rate 328 services, these were actually Rate 228 services because Rate 328 did not come into use until October 13, 1990, one day after the relevant time period.

**2.** Although the parties have stipulated that Debtor owed Northern Indiana a total of $25,786.13, the sum of $1,294.15 and $24,592.58 equals $25,886.73, not $25,786.13.

**3.** The parties agree the law of Indiana applies in this case. *See* Ind.Code §§ 26–1–7–209, 26–1–7–202.

of the following, the warehouseman is liable for damages caused by the omission to a person injured thereby:

(a) the location of the warehouse where the goods are stored;

(b) the date of issue of the receipt;

(c) the consecutive number of the receipt;

(d) a statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order;

(e) the rate of storage and handling charges, except that where goods are stored under a field warehousing arrangement a statement of that fact is sufficient on a nonnegotiable receipt;

(f) a description of the goods or of the packages containing them;

(g) the signature of the warehouseman, which may be made by his authorized agent;

(h) if the receipt is issued for goods of which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership; and

(i) a statement of the amount of advances made and of liabilities incurred for which the warehouseman claims a lien or security interest (IC 26–1–7–209). If the precise amount of such advances made or of such liabilities incurred is, at the time of the issue of the receipt, unknown to the warehouseman or to his agent who issues it, a statement of the fact that advances have been made or liabilities incurred and the purpose thereof is sufficient.

(3) A warehouseman may insert in his receipt any other terms which are not contrary to the provisions of IC 26–1 and do not impair his obligation of delivery (IC 26–1–7–403) or his duty of care (IC 26–1–7–204). Any contrary provisions shall be ineffective.

■ The receipt must cover specific goods in the warehouseman's possession and such goods must be identifiable or a fungible portion of an identifiable mass.[4] There does not appear to be a requirement that the warehouse receipt state it is a lien or creates a lien on the goods. However, if the warehouseman seeks a general lien, then the receipt must show that a lien is claimed for storage of goods other than those described on the specific receipt. Ind.Code § 26–1–7–209(1); Hawkland et al., *supra*, at § 7–209:02.

■ The extent of the lien goes not only to the goods described but to the charges for storage plus any reasonable and ordinary charges required by a warehouseman. Hawkland et al., *supra*, at § 7–209:03. If there is no rate for storage set out in the receipt, the warehouseman is limited to a reasonable charge. Hawkland et al., *supra*, at § 7–209:02. The date of the warehouse receipt is an essential term but it can be shown by parol evidence, and finally, the receipt must at least be mailed or transmitted to the customer/bailor. *Cataldo v. Casey and Hayes, Inc. (In re Knoware)*, 57 B.R. 163 (Bankr.D.Mass. 1986). Many of these issues have been discussed by my learned colleague in *Panocean Southland Inc. v. Charter International Oil Co. (In re Charter Co.)*, 56 B.R. 91 (Bankr.M.D.Fla.1985), construing a similar Georgia statute. Ultimately, if there is no warehouse receipt, there can be no warehouseman's lien.

## FINDINGS OF FACT

■ This Court, after reviewing the documents, affidavits and record in this case, finds the following:

1. While it may be inferred from the stipulated facts and the agreements between the parties that Northern Indiana is a warehouseman as defined by law, this

---

**4.** The identification of the goods is important because under the Uniform Commercial Code a lien only covers the property described in the warehouse receipt as distinguished from the former Uniform Warehouse Receipts Act (Ind.Code § 67–401 *et seq.* (Burns 1961)) which provided that the lien attached to all goods deposited with the warehouseman. The probable reason for the distinction is the existence in commercial law of two types of liens: a specific lien arising for the storage charges of the specified goods and a general lien arising for the storage charges of goods not on a warehouse receipt. *See McCausland v. Tide–Mayflower Moving and Storage*, 499 So.2d 1378 (Ala.1986); *but see* Hawkland et al., *supra*, at § 7–209:01.

Court finds no clear stipulation or document to that effect.

2. The documents alleged by Northern Indiana collectively to constitute a warehouse receipt are entitled "Industrial Gas Service Bill" (service bills).

3. The service bills list a service address, but the service bills do not show, as required by statute, the location of the warehouse where the goods are stored.[5] Ind.Code § 26–1–7–202(2)(a).

4. The service bills are dated. Ind.Code § 26–1–7–202(2)(b).

5. The service bills do not bear any receipt numbers or other consecutive numbers. Ind.Code § 26–1–7–202(2)(c).

6. The service bills do not state whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order. Ind.Code § 26–1–7–202(2)(d); *see Nuclear Facilities, Inc. v. Advance Relocation and Storage,* 571 N.Y.S.2d 36 (N.Y.App.Div.1991).

7. The service bills contain dollar amounts which appear to be charges and appear to be rates related to services provided by Northern Indiana. The Court, however, is uncertain whether or not charges such as "customer charge, reservation charge, injection charge, withdrawal charge, transportation charge, balancing charge, and take-or-pay surcharge" are in fact storage charges. Ind.Code § 26–1–7–202(2)(e).

8. The service bills do identify the goods in therms of gas. Ind.Code § 26–1–7–202(2)(f).

9. The service bills are not signed by Northern Indiana's authorized agent as a warehouseman. Ind.Code § 26–1–7–202(2)(g).

10. The service bills contain no statement of the amount of advances made and liabilities incurred for which Northern Indiana claims a lien or security interest. The Court, in considering the statute, believes there are possibly more charges for which Northern Indiana could claim a lien other than for the rate of storage. The Court finds that since the service bills do not state an amount of advances or liabilities there are none other than for storage. Ind.Code § 26–1–7–202(2)(i).

11. Since the service bills do not specify a lien for charges for storage of goods not covered by the service bills, any lien sought by Northern Indiana can only be for those goods deposited and described in its documents.

12. The service bills do not provide that the possessor of the service bills shall be entitled to receive or dispose of the goods described in the service bills. The Court finds this requirement is consistent with the concept that a warehouse receipt is a document of title and is expansive of that part of the statute requiring a statement that the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order. Ind.Code §§ 26–1–1–201(15), 26–1–7–202(2)(d).

13. While Northern Indiana's service bills appear to be issued in the normal course of business, there is no showing the service bills were so issued as part of Northern Indiana's warehouse business. The Court makes this finding upon reviewing the Contract for Gas Service made between the parties on March 4, 1987, and its various conditions, as well as the Contract for Gas Service—Experimental Best Efforts Storage Service dated June 1, 1989. None of these documents speaks to the issuance of a warehouse receipt as part of the ongoing activities between the parties.

14. The Court finds Debtor and other third parties are not limited to their damages against a warehouseman whose receipt does not conform to the statute. The failure to comply with the statute results in no lien creation.

15. As to any carrier's lien claimed by Northern Indiana, there is no bill of lading issued by Northern Indiana which would establish such a lien. Ind. Code § 26–1–7–307.

16. As to any artisan's lien claimed by Northern Indiana under statute

---

**5.** The parties are in agreement as to where the therms of gas are presently located.

or the common law of Indiana, no lien has been created since Northern Indiana has not repaired, manufactured or processed the gas. Moreover, Northern Indiana has not issued the requisite statutory receipt in order to acquire an artisan's lien. Ind.Code § 32–8–30–9.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Northern Indiana does not have a valid warehouseman's lien against Debtor on 196,800 therms of natural gas. It is further

ORDERED, ADJUDGED AND DECREED that Northern Indiana does not have a valid carrier's lien against Debtor on 196,800 therms of natural gas. It is further

ORDERED, ADJUDGED AND DECREED that Northern Indiana does not have a valid artisan's lien against Debtor on 196,800 therms of natural gas. It is further

ORDERED, ADJUDGED AND DECREED that Northern Indiana's Amended Motion for Relief from Automatic Stay is denied.

DONE AND ORDERED.