**In re SIENA PUBLISHERS ASSOCIATES, Debtor.**

**Bankruptcy No. 92 B 20511.**

United States Bankruptcy Court, S.D. New York.

Jan. 15, 1993.

Scherling, Davidson & Rech, P.C., New York City, for Harris Trust and Sav. Bank.

Oxman Geiger Natale & Tulis, P.C., Hawthorne, for debtor.

Ballon, Stoll, Bader & Nadler, P.C., New York City, for Creditors Committee.

Norman M. Block, P.C., Hawthorne, for MSI Associates, L.P.

## DECISION ON MOTION TO DISBURSE CASH COLLATERAL TO HARRIS TRUST AND SAVINGS BANK

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

Apart from certain factual questions, the legal issue to be resolved in this contested matter is whether a warehouseman's lien primes a pre-existing perfected security interest. Harris Trust and Savings Bank ("Bank") has applied to this court for an order directing that the net proceeds resulting from the liquidation of its security interest in the debtor's inventory be distrib-uted to it after the payment of all accrued fees owed to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a)(6). MSI Associates, L.P. ("MSI") has objected to the Bank's application because it asserts a warehouseman's lien which it claims takes priority over the Bank's interest.

### FINDINGS OF FACT

1. On March 18, 1992, the debtor, Siena Publishers Associates, a limited partnership engaged in the business of wholesaling remainder books, filed with this court a petition for relief under Chapter 11 of the Bankruptcy Code and continued in possession of its property as a debtor in possession until the case was converted for liquidation under Chapter 7 of the Bankruptcy Code on December 14, 1992.

2. On October 16, 1989, the Bank sold to the debtor at a private liquidation sale, which the Bank alleges was conducted pursuant to Section 9–504(3) of the Uniform Commercial Code as adopted by New York, the book inventory and accounts receivable of Bookthrift Marketing, Inc. ("Bookthrift"), another entity engaged in the business of distributing remainder books. Bookthrift had defaulted under a collateralized loan made by the Bank to Bookthrift, resulting in an unpaid balance of approximately $5.7 million.

3. The Agreement of Purchase and Sale between the debtor and the Bank dated October 16, 1989 was signed by the Bank and by Joseph Tesoriere ("Tesoriere"), President of ZCI of Delaware Inc. ("ZCI"), the corporate general partner of the debtor. Tesoriere is also the President of NCI, the corporate general partner of MSI, which claims a warehouseman's lien against the debtor's book inventory.

4. The Agreement of Purchase and Sale recites that the Bank exercised its rights under Section 9–504 of the Uniform Commercial Code to hold a private sale of certain assets of Bookthrift. The assets were sold on an "as is," "where is" basis, without representation, recourse or warranty, including title or description. The consider-

ation to be paid by the debtor was $2,520,-000.00.

5. Bookthrift consented to the private sale in a letter to the Bank dated October 16, 1984, which states in relevant part as follows:

October 16, 1989

Harris Trust and Savings Bank
111 West Monroe Street
Chicago, Illinois 60603
Attention: Charles R. Smith

Re: *Sale of Assets of Bookthrift Marketing, Inc.*

Gentlemen:

We recently received your written notice of your upcoming private sale of Bookthrift's assets to Joe Tesoriere's company, Siena Publishers. As you know, we originally intended to sell Bookthrift's assets directly to Joe's company and we now concur that your private foreclosure sale of these assets is a better means of realizing on the assets for all concerned. Although our consent is not required for you to take this action, we are writing this letter to express our support for this sale.

... We also feel that a private sale to Joe will yield a higher price than would a forced liquidation of Bookthrift's assets. A public auction may also have the effect of encouraging other creditors to take drastic means to prevent the sale to Joe. Because of the amount of Joe's offer (it is, as we said, not only the highest but also the only offer received after an exhaustive search of the market for a buyer) and the potential adverse consequences of the notice (and possibly delay) inherent in a public sale, we believe that your private sale to Siena Publishers is not only "commercially reasonable" in the terms our lawyers use, but extremely desirable to us in reducing the amount of the deficiency for which we will be liable. We strongly urge you to go through with the private sale.

*Exhibit* 1 (Document 5).

6. The Bank financed the purchase price of the Bookthrift assets acquired by the debtor. Pursuant to a demand note dated October 19, 1989, the debtor promised to pay to the Bank on demand the sum of $2,250,000.00, representing the purchase price of the Bookthrift assets. To secure the $2,250,000.00 purchase obligation, Tesoriere, as President of the debtor's corporate general partner, ZCI, executed a Security Agreement in favor of the Bank, dated October 19, 1989. Pursuant to the Security Agreement, the debtor granted the Bank a purchase money security interest in all of the debtor's accounts receivable, general intangibles, inventory and equipment.

7. UCC–1 Financing Statements were filed by the Bank with the Rockland County Clerk on November 10, 1989, the New York Secretary of State on November 13, 1989, and the New York County Register on November 21, 1989.

8. When the debtor filed its Chapter 11 petition on March 18, 1992, it was indebted to the Bank under the purchase money demand note in the principal amount of $666,012.33, together with unpaid interest. This indebtedness was secured by the Bank's validly perfected security interest in all of the debtor's assets.

9. Pursuant to a Stipulation and Order entered on May 8, 1992, the debtor, the Bank and MSI authorized Henry A. Leonard and Co., auctioneers, to conduct a liquidation sale of the debtor's inventory with all liens and claims of the parties to attach to the proceeds. The net balance of the sale, after disbursements and commissions, amounts to $250,281.07, which is held in a segregated account, subject to distribution pursuant to court order.

10. MSI, through Tesoriere, as President of NCI of New York, Corp. ("NCI"), its corporate general partner, claims a warehouseman's lien against the proceeds of sale in the amount of $228,761.30. As previously noted, Tesoriere is also the president of the debtor's corporate general partner, ZCI.

11. Prior to August 31, 1989, an entity named Metro Services, Inc. ("Metro") provided fulfillment and warehousing services for Bookthrift. Fulfillment services include the receipt and unloading of books from delivering carriers, storage of the

books, picking, counting, packing, loading and shipping books pursuant to instructions, preparation and maintenance of inventory records, and obtaining and arranging transportation for outgoing shipments in accordance with instructions.

12. Metro was also indebted to the Bank for loans previously advanced to it by the Bank. As in the case of Bookthrift, Metro similarly defaulted on its loans from the Bank. Thus, not only did the Bank finance a sale of Bookthrift's assets to the debtor, but it also arranged a sale of Metro's assets to another entity, namely NCI. The Asset Purchase Agreement between Metro and NCI was made as of August 31, 1989. As a result of the NCI's asset purchase transaction with Metro, Metro's indebtedness to the Bank was fully paid.

13. Section B(III) in Exhibit 1 attached to the NCI's Asset Purchase Agreement specifically states that Metro did not transfer to NCI "Any and all accounts receivable." Hence, NCI did not acquire Metro's existing fulfillment services claim against Bookthrift. *Trial Exhibit* A (Section B(III) of Exhibit 1 which was incorporated in the Asset Purchase Agreement).

14. There was no evidence that NCI, MSI's corporate general partner, ever assigned to MSI the assets which it purchased from Metro.

15. On August 29, 1990, more than nine months after the Bank filed its UCC–1 Financing Statements with respect to its secured transaction with the debtor, MSI and the debtor entered into a written Fulfillment Services Agreement. MSI agreed to perform fulfillment and warehousing services for the debtor in the same fashion as Metro had previously acted for Bookthrift before Bookthrift sold its inventory to the debtor and before Metro sold its assets, but not its accounts receivable, to NCI.

16. MSI may not claim a warehouseman's lien for any period prior to August 29, 1990, when it entered into the Fulfillment Services Agreement with the debtor. Hence, the Bank's perfected secured interest in the debtor's assets preceded MSI's claimed warehouseman's lien.

17. Because NCI purchased Metro's assets only, and not Metro's accounts receivable, neither NCI nor MSI can claim to have acquired any warehouseman's lien that Metro may have had with respect to its accounts receivable from either Bookthrift or the debtor after it purchased Bookthrift's inventory.

18. Tesoriere testified that MSI submitted to the debtor on a regular basis computer reports listing the specific titles and quantities of books belonging to the debtor, with item costs, quantity on hand, total cost, item price and publishing dates. *Trial Exhibit* F. The computer report does not specify the location of the warehouse where the goods are stored, or a statement as to whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order. The computer report does not contain any signature of MSI or its authorized agent. The computer report does not specify the amount of advances made and liabilities incurred for which MSI claims a lien or security interest. Nor does the computer report contain any statement that advances have been made or that liabilities have been incurred by the debtor.

19. The Fulfillment Services Agreement between MSI and the debtor, dated as of August 29, 1990, and the computer reports issued by MSI, do not contain the essential terms for a warehouse receipt specified in N.Y.U.C.C. § 7–202(2).

## DISCUSSION

### *Warehouse Receipts*

■ A warehouse lien is statutory and pursuant to New York UCC § 7–209(1), it is only available upon goods for which a warehouse receipt has been issued. *Dathar Corp. v. Lemkin*, 14 UCC Rep.Serv. 1207, 1208 (N.Y.Sup.Ct.1974). The essential elements of a warehouse receipt are delineated in New York UCC § 7–202, which provides that while a warehouse receipt need not be in any particular form, it should embody certain essential information as follows:

(a) the location of the warehouse where the goods are stored;

(b) the date of issue of the receipt;

(c) the consecutive number of the receipt;

(d) a statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order;

(e) the rate of storage and handling charges, except that where goods are stored under a filed warehousing arrangement a statement of that fact is sufficient on a non-negotiable receipt;

(f) a description of the goods or of the packages containing them;

(g) the signature of the warehouseman, which may be made by his authorized agent;

(h) if the receipt is issued for goods of which the warehouseman is owner, either solely or jointly or in common with others, the fact of such ownership; and;

(i) a statement of the amount of advances made and of liabilities incurred for which the warehouseman claims a lien or security interest (Section 7–209). If the precise amount of such advances made or of such liabilities incurred is, at the time of the issue of the receipt, unknown to the warehouseman or to his agent who issues it, a statement of the fact that advances have been made or liabilities incurred and the purpose thereof is sufficient.

N.Y.U.C.C. § 7–202(2).

■ MSI claims that its Fulfillment Services Agreement with the debtor, as of August 29, 1990, and the computer reports submitted to the debtor constitute the requisite warehouse receipts. As stated by New York Supreme Court, Appellate Division:

Missing are "a statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order" (UCC 7–202[2][d]), the "rate of storage" (UCC 217–202[2][e]), and the "signature of the warehouseman" (UCC § 7–202[2][g]).

*Nuclear Facilities, Inc. v. Advance Relocation & Storage, Inc.,* [15 UCC Rep.

Serv.2d 1290, 1291], 173 A.D.2d 802, 803, 571 N.Y.S.2d 36, 37 (1991). Moreover, the documents claimed collectively to constitute the warehouse receipts do not show, as required by statute, the location of the warehouse where the goods are stored, they do not show a statement of the amount of advances made and liabilities incurred for which MSI claims a lien and they do not bear any receipt numbers or other consecutive numbers. *See In re Celotex Corp.,* 134 B.R. 993 (Bankr.M.D.Fla. 1991). A warehouse receipt is a condition precedent to establishing a lien on the goods in the possession of the warehouseman. *Id.* Because the documents referred to by MSI do not contain the essential information necessary to qualify as a warehouse receipt, it follows that MSI may not claim a warehouse lien against the proceeds from the liquidation of the debtor's inventory.

### Priority

There is another reason why MSI may not trump the Bank's perfected security interest. Pursuant to N.Y.U.C.C. § 9–310, a statutory lien for furnishing services or materials with respect to goods is given priority over a pre-existing perfected security interest unless the Uniform Commercial Code as adopted by New York expressly provides otherwise. This priority is stated as follows:

**§ 9–310. Priority of Certain Liens Arising by Operation of Law**

When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest *unless the lien is statutory and the statute expressly provides otherwise.*

N.Y.U.C.C. § 9–310 (emphasis added). A warehouseman's lien is a statutory lien and is authorized under N.Y.U.C.C. § 7–209(1). *Dathar,* 14 UCC Rep.Serv. at 1208. The general priority granted under N.Y.U.C.C. § 9–310 may not exist, however, if there is

a different provision expressed in New York's Uniform Commercial Code.

■ A different provision is specified in New York UCC § 7–209(3) with respect to warehouseman's liens as follows:

(3) A warehouseman's lien for charges and expenses under subsection (1) or a security interest under subsection (2) is also effective against any person who so entrusted the bailor with possession of the goods that a pledge of them by him to a good faith purchaser for value would have been valid but is not effective against a person as to whom the document confers no right in the goods covered by it under section 7–503.

N.Y.U.C.C. § 7–209(3). Thus, the warehouseman's lien is not effective against a security interest held by a third party, such as the Bank, unless the Bank so entrusted the debtor-depositor with possession of the goods that a pledge of the goods by the debtor-depositor would have given a hypothetical bona fide pledgee priority over the Bank. The Official Comment to New York UCC § 7–209(3) explains this point in the following manner:

Where the third party is the holder of a security interest, the rights of the warehouseman depend on the priority given to a hypothetical bona fide pledgee by Article 9, particularly Section 9–312. Thus the special priority granted to statutory liens by Section 9–310 does not apply to liens under subsection (1) of this section [7–209], since subsection (3) [of section 7–209] "expressly provides otherwise" within the meaning of Section 9–310.

N.Y.U.C.C. § 7–209(3) cmt. 3.

■ The warehouseman's lien is not effective against third party secured interests unless the depositor-debtor had power to create a valid pledge. *Jones v. Banner Moving & Storage, Inc.,* 78 Misc.2d 762, 358 N.Y.S.2d 885, 15 UCC Rep.Serv. 1, 5 (1974), *aff'd in part, modified in part on other grounds,* 48 A.D.2d 928, 369 N.Y.S.2d 804, 17 UCC Rep.Serv. 492 (1975). In this case the debtor could not validly pledge its inventory to a bona fide pledgee for value because the Bank possessed a validly perfected security interest in all of the debtor's assets, including its inventory. Therefore, the claimed warehouse lien could not be effective against the Bank's perfected security interest because N.Y.U.C.C. § 7–209(3) supersedes the priority for a statutory lien that would otherwise apply under N.Y.U.C.C. § 9–310. *See Curry Grain Storage, Inc. v. Hesston Corp.,* 120 Idaho 328, 815 P.2d 1068, 16 UCC Rep.Serv.2d 191 (1991). In attempting to interpret section 7–209(3) one commentator noted:

... On this, the drafters observe with an awe-inspiring brevity, matched only by the poverty of the light it casts, that "Where the third party is the holder of a security interest, the rights of the warehouseman depend on the priority given to a hypothetical bona fide pledgee by Article 9, particularly 9–312." (Official Comment 3 to 9–207.)

If we assume such a third person does, in fact, have a security interest in the stored goods and is now in conflict with the warehouseman asserting a lien under 7–209, can the warehouseman, by a sort of reverse English, claim the "lien protection" accorded by 9–310 and perhaps come out ahead on a 9–310 basis? The drafters' answer to that inquiry is negative. Thus "the special priority granted to statutory liens by Section 9–310 does not apply to liens under subsection (1) of this section, since subsection (3) 'expressly provides otherwise' within the meaning of Section 9–310." (Official 3 to 7–209.)

Quinn, *Quinn's Uniform Commercial Code Commentary and Law Digest* ¶ 7–209[A][1], at 7–41 (2d ed. 1991).

This conclusion is consistent with the applicable law before New York U.C.C. § 7–209(3) was adopted. Under former section 113 of the New York General Business Law, the lien of a warehouseman was not superior to that of a prior mortgagee of stored chattels, if the chattel mortgagee had duly filed its mortgage. *Buckley Newhall Co., Inc. v. Bangs,* 130 Misc. 293, 224 N.Y.S. 71 (1927); *Ludwig, Baumann & Co. v. Roth,* 67 Misc. 458, 123 N.Y.S. 191 (1910); *Singer Mfg. Co. v. Becket,* 85

N.Y.S. 391 (1903); *Allen v. Becket,* 84 N.Y.S. 1007 (1903).

MSI argues that pursuant to N.Y.U.C.C. § 9–307, the debtor could have sold the inventory to a buyer in the ordinary course of business who could then take title free from the Bank's security interest. MSI contends that such a sale would defeat the Bank's interest and would prioritize its warehouseman's lien pursuant to the exception expressed in N.Y.U.C.C. § 7–209(3). Section 9–307 resolves conflicts between parties claiming an interest in property subject to a security interest that is sold in the ordinary course of business and provides that under such sales the buyer acquires the property free from the security interest even though the buyer knows of the existence of the security interest. On the other hand, section N.Y.U.C.C. § 7–209(3) is not directed toward sales in the ordinary course of business. Section 7–209(3) provides that the rights of the warehouseman depend on the priority given to a hypothetical bona fide pledgee and has nothing to do with sales in the ordinary course of business.

A buyer in the ordinary course of business, as expressed in N.Y.U.C.C. § 9–307 does not have the same legal characteristics as a bona fide pledgee of goods under N.Y.U.C.C. § 7–209(3) which omits any reference to ordinary course of business transactions. This point is made clear in Official Comment 3 to § 7–209(3), which states that "the rights of the warehouseman depend on the priority given to a hypothetical bona fide *pledgee* by Article 9...." (emphasis added). The hypothetical bona fide pledgee, unlike the buyer in ordinary course of business who may have knowledge of the pre-existing security interest, as expressed in N.Y.U.C.C. § 9–307, is a good faith pledgee who does not have knowledge of the pre-existing security interest and against whom the security interest is not effective, such as where the security interest was not validly perfected. Accordingly, N.Y.U.C.C. § 9–307 does not apply to the factors delineated in N.Y.U.C.C. § 7–209(3) in determining the priority of a warehouseman's lien vis a vis a pre-existing security interest.

Because a hypothetical bona fide pledgee will not have priority over the Bank's pre-existing perfected security interest, it follows that MSI's claimed warehouseman's lien will also not have priority over the Bank's pre-existing security interest.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and the parties in accordance with 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A) and (K).

2. The documents claimed by MSI to constitute a warehouse receipt required by New York UCC § 7–202 do not contain the essential information required by subsection (2) to qualify as a warehouse receipt.

3. MSI does not have a valid warehouseman's lien against the debtor's liquidated inventory.

4. Pursuant to N.Y.U.C.C. § 7–209(3), MSI's claimed warehouseman's lien does not have priority over the Bank's pre-existing perfected security interest in the debtor's inventory.

5. As between the Bank and MSI, the proceeds from the liquidation of the debtor's inventory may be distributed to the Bank after the payment of the United States trustee's statutory fees.

SETTLE ORDER on notice in accordance with the foregoing.