**In the Matter of Stanley Neal McDONALD, Debtor.**

**Stanley Neal McDONALD, Plaintiff,**

**v.**

**OCILLA COTTON WAREHOUSE, INC. and Shekinah Cotton, Inc., Defendant.**

Bankruptcy No. 95–50276–JDW.
Adversary No. 97–05019A–JDW.

United States Bankruptcy Court,
S.D. Georgia,
Waycross Division.

Aug. 31, 1998.

Jesse C. Stone, Swainsboro, GA, for Debtor.

J. Harvey Davis, Ocilla, GA, for Ocilla Cotton Warehouse, Inc.

R. Michael Souther, Brunswick, GA, for Shekinah Cotton, Inc.

Stephenson Wallace, Augusta, GA, Chapter 12 Trustee.

## MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Motion for Reconsideration filed by Stanley Neal McDonald as Debtor–in–Possession ("Movant"). A decision was previously announced in open Court on June 25, 1998, and entered by judgment on July 9, 1998. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(E). After considering the pleadings, evidence presented and applicable authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Stanley Neal McDonald ("Debtor") financed his 1994 cotton crop with a loan from The Patterson Bank ("Bank"). On May 5, 1994, Debtor signed a security agreement granting Bank a security interest in Debtor's cotton crop as collateral for the loan. Bank perfected its interest on May 6, 1994 by filing a U.C.C. financing statement in Ware County. On July 6, 1994, Bank sent Ocilla Gin Co. ("Ocilla"),[1] previously identified by Debtor as a potential selling agent,[2] notice of its security interest. This notice informed Ocilla that it had been identified as a potential selling agent and that it would be subject to Bank's security interest on any proceeds from a sale of Debtor's cotton through Ocilla unless any check or draft issued to Debtor was made in both the Debtor and Bank's name.

Before Debtor's cotton crop was harvested, Debtor and persons authorized by Debtor "booked" three, one-hundred bale orders of cotton. These bookings occurred on the 6th, 9th and 10th of June 1994. Booking an order locks the selling price for that order at the market price for cotton on the day the booking takes place. A farmer books when it is believed the market price will drop so that the farmer can take advantage of a higher selling price at the time of sale. However, by doing so, the farmer also subjects himself to the perils of market price fluctuations. The market price for cotton on the days these orders were booked varied from seventy to seventy-five cents per pound.

Upon receiving the three orders, Ocilla contacted Shekinah Cotton, Inc. ("Shekinah") and arranged to place the orders with Shekinah. Shekinah then drafted three contracts to buy the cotton, each contract corresponding to each separate order, and forwarded the contracts to Ocilla. The contracts originally listed Ocilla and Debtor as the sellers of the cotton. However, Ocilla returned the contracts to Shekinah stating that Debtor was the only seller. Shekinah redrafted the contracts listing only Debtor as seller and forwarded the new contracts to Ocilla. Ocilla, in turn, forwarded the contracts to Debtor on June 12, 1994.[3]

Debtor had expected that his crop would yield more than 300 bales of cotton. However, because of excessive rainfall, Debtor's crop was only able to yield 106 bales. Ocilla picked, ginned, and stored Debtor's cotton, issuing warehouse receipts which represented the cotton held in storage. While in storage, the market price for cotton rose above the price contained in the contracts.

On March 3, 1995, Shekinah demanded that Ocilla deliver the cotton due under the three contracts. Because of Debtor's partial crop failure, Ocilla was only able to send Shekinah warehouse receipts evidencing 106 bales of cotton instead of the 300 bales con-

---

1. Ocilla Gin Co. and Ocilla Warehouse, Inc. have the same officers and shareholders and operate out of the same office. "Ocilla" will refer to these companies jointly as there is no reason to distinguish between them for purposes of this opinion.

2. A "selling agent" is "any person, other than a commission merchant, who is engaged in the business of negotiating the sale and purchase of any farm product on behalf of a person engaged in farming operations." 7 U.S.C. § 1631(c)(8) (1988).

3. Debtor never returned the signed contracts. At the trial he claimed that he notified Ocilla that he had not authorized two of the three contracts. That contention was denied by Ocilla. The Court held as a finding of fact that no such notice was given by Debtor to Ocilla. While it is likely that Debtor disputes that finding, it is not the subject of this Motion for Reconsideration. The reasons for this conclusion are detailed in the findings of fact announced in open court at the conclusion of the trial.

tracted for. Ocilla retained the cotton evidenced by those receipts. Shekinah, as a result of Debtor's breach, was required to purchase the remaining 194 bales of cotton elsewhere. At the time Shekinah learned that Ocilla would be unable to deliver the remaining 194 bales of cotton, the market price for cotton had risen to $1.06 per pound—approximately thirty cents above the contract price. As a result, Shekinah suffered a $28,619.90 loss. Shekinah offset this loss against the $34,404.65 contract price for the 106 delivered bales of cotton and on March 17, 1994 remitted the remaining $5,784.75 to Ocilla. Ocilla used these proceeds to satisfy the costs of picking, ginning, and storing Debtor's cotton. The $5,784.75 did not fully satisfy these costs and as a result, Debtor received no proceeds from the sale. Approximately two months later, Debtor filed a petition under Chapter 12 of the Bankruptcy Code.

At the hearing, Movant sought an order from the Court declaring that Shekinah and Ocilla took the cotton subject to Bank's security interest, that the full $34,404.65 price for the 106 bales of delivered cotton constituted proceeds of the cotton subject to Bank's security interest, and that Shekinah and Ocilla were thus not entitled to offset their claims against Debtor from these proceeds. In the alternative, Movant sought an order from the Court finding that Shekinah's and Ocilla's use of the proceeds constituted avoidable set-off preferences under 11 U.S.C. § 553(b) (1988). The Court found that Shekinah was entitled to offset its damages claim against Debtor from the price owing for delivery of the 106 bales, and that Ocilla was entitled to offset its costs for picking, ginning, and storing the cotton from the remaining proceeds. The Court further found that the exercise of these rights did not constitute avoidable set-off preferences under section 553(b). Movant seeks reconsideration of its claims by the Court.

### Conclusions of Law

The first issue before this Court is whether Shekinah and Ocilla were entitled to offset their claims against Debtor from the contract price for the delivered 106 bales of cotton.

Movant contends that the contract price due for delivery of the 106 bales of cotton constituted proceeds of the cotton subject to Bank's security interest. Movant argues that under the Food Security Act of 1985, 7 U.S.C. § 1631 (1988 & Supp.1998), Shekinah's and Ocilla's claims were subordinate to Bank's security interest in the proceeds and their use of such proceeds thus constitutes conversion.

The Food Security Act was enacted by Congress in response to the farm products rule contained in U.C.C. § 9–307(1) as adopted by most jurisdictions. In Georgia, O.C.G.A. § 11–9–307(1) (1994) provides that a "buyer in the ordinary course of business ... takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." However, section 11–9–307(1) expressly singles out buyers of farm products and excludes them from this rule. Thus, unless the secured lender authorized the sale, *Id.* § 11–9–306(2), a purchaser of farm products always takes subject to a prior security interest. This is the farm products rule.

Congress found that such a rule unfairly subjects purchasers of farm products to the possibility of double payment for the products even if the purchaser is not aware of the security interest, cannot discover the security interest, and has no means to ensure the seller will repay the lender with the proceeds from the sale. 7 U.S.C. § 1631(a)(1),(2). This double payment would occur first at the time of purchase when the purchaser pays the seller, and second, when the seller becomes liable to pay the proceeds to the lender after seller has failed to pay the lender. *Id.* § 1631(a)(2).

Deciding that such exposure was a burden on interstate commerce in farm products, Congress expressly preempted the farm products rule with the Food Security Act. The Act provides that buyers of farm products in the ordinary course of business, and selling agents and commission merchants who sell farm products in the ordinary course of business, shall take free of a security interest created by their seller even if the interest is perfected and they are aware of

the interest. *Id.* § 1631(d), (g). However, the Act does contain provisions that allow the secured lender to retain its security interest in the collateral. The buyer/selling agent/commission merchant will take subject to the security interest if they receive written notice of the security interest from the secured lender or seller within one year before the sale.[4] *Id.* § 1631(e), (g)(2). The Court will now consider what effect the Food Security Act has on Shekinah's and Ocilla's right to offset their claims against the price of the 106 delivered bales of cotton.

### Shekinah's Right to Offset Its Loss

A security interest continues in proceeds from the sale of collateral only if such proceeds are identifiable. O.C.G.A. § 11–9–306(2). Further, a security interest does not attach to collateral in which the debtor has no rights. *Id.* § 11–9–203(1)(c). The price under the contract between Shekinah and Debtor for delivery of 106 bales of cotton totaled $34,404.65. However, this $34,404.65 did not constitute *identifiable* proceeds. The proceeds are not identifiable, and debtor has no rights in them, until the buyer's obligation is fully determined and paid. Here, as will be seen, Shekinah had no obligation to pay the full $34,404.65.

When a seller breaches a whole contract by failing to deliver goods, as Debtor has here, the buyer is entitled to cover. O.C.G.A. § 11–2–711(1)(a) (1994). The buyer covers by, in good faith and without unreasonable delay, reasonably purchasing or contracting to purchase substitute goods. *Id.* § 11–2–712(1). If the cost of the substitute goods exceeds the contract price, the buyer may recover the difference from the seller. *Id.* § 11–2–712(2). The buyer can recover this difference, upon notifying the seller of his intention to do so, by subtracting it from any part of the price still due under the contract for those goods actually delivered by the seller. *Id.* § 11–2–717.

The contracts between Shekinah and Debtor were all between the same parties, contained the same terms, and provided for delivery on the same date. Therefore, the Court finds that this was an inseverable contract. The contract called for delivery of 300 bales of cotton. Shekinah only received 106 bales and, due to a poor crop season, Debtor was unable to deliver the remaining 194 bales. Thus, Debtor's failure to fully deliver constituted a breach of the entire contract. Because of Debtor's breach, Shekinah was forced to acquire the 194 bales elsewhere. Because the market price of cotton had risen during the contract period from around $0.75 per pound to $1.06 per pound, Shekinah had to cover at a higher price on the date it learned of Debtor's breach. This left Shekinah with a loss totaling $28,619.90. Section 11–2–717 allowed Shekinah to deduct those damages from the $34,404.65 still due under the contract.

Shekinah's right to deduct those damages was in the nature of a recoupment. "Recoupment is the right of the defendant to have a deduction from the amount of the plaintiff's damages for the reason that plaintiff has not complied with the cross-obligations ... arising under the contract upon which suit is brought." O.C.G.A. § 13–7–2 (1982). Recoupment allows a court to look at the whole contract, sum up the grievances on each side, strike a balance, and give the plaintiff judgment for only such difference as may be found in his favor. *Toole v. Brownlow & Sons Co.*, 151 Ga.App. 292, 294, 259 S.E.2d 691, 693 (1979). The effect of recoupment is a downward adjustment in contract price. *Id.* Its purpose rests on equitable grounds to prevent unjust enrichment. *Anthem Life Ins. Co. v. Izaguirre (In re Izaguirre)*, 166 B.R. 484, 491 (Bankr.N.D.Ga. 1994).

Here, Movant claims Debtor was entitled to the full contract price of $34,404.65 for delivering 106 bales of cotton. Shekinah, however, suffered a $28,619.90 loss because of Debtor's failure to deliver the remaining 194 bales of cotton required by that same contract. There would be no equity in requiring Shekinah to pay $34,404.65 and lose

---

4. In the alternative, the secured lender can protect its interest by filing an "effective filing statement" in a state that has a central filing system.

7 U.S.C. § 1631(e), (g)(2). This option was not available in Georgia at the time of this transaction.

$28,619.90 in the same transaction. After looking at the whole contract and summing up the grievances on each side, Debtor only had a right to the remaining $5,784.75. In effect, there was a downward adjustment in contract price from approximately $0.75 per pound to approximately $0.13 per pound as a consequence of Debtor's failure to comply with his requirement to deliver the 194 bales. This net of $5,784.75 constituted the identifiable proceeds, which Shekinah properly remitted to Ocilla.[5] Therefore, the Court finds that it was proper for Shekinah to net its loss against the "booked" purchase price of the cotton.

■ As a result of the foregoing analysis, it is unnecessary for this Court to decide whether, under the Food Security Act, Shekinah bought Debtor's cotton subject to Bank's security interest. The Food Security Act determines whether a buyer of farm products takes free or subject to a security interest created by its seller. Whether Shekinah took free of Bank's security interest or not, Bank is still entitled to the identifiable proceeds from the sale of its collateral. O.C.G.A. § 11–9–306(2). As previously noted, Shekinah properly remitted these proceeds to Ocilla. Thus, the Food Security Act does not influence the resolution of this issue.

### Ocilla's Right to Offset Picking, Ginning, and Storage Costs

The Court now turns to Movant's claim that Ocilla converted Bank's collateral by using the $5,784.75 proceeds from the sale of Debtor's cotton to offset its costs for picking, ginning, and storing the cotton, rather than turning the proceeds over to Debtor as required by the written notice received by Ocilla from Bank notifying Ocilla of Bank's security interest. In relevant part, this notice stated:

The Debtor has named you as a potential ... selling agent of farm products.... You will be subject to the security interest of the Secured Party in the farm products

unless ... [a]ny check or draft issued to Debtor ... for any sale of such farm products must be payable to both the Debtor and the Secured Party....

Contrary to Movant's assertions, however, the Court finds that rather than preventing Ocilla from using the proceeds to offset its costs, this notice is the source of Ocilla's right to offset its costs.

■ Section 1631(g)(2)(A) of the Food Security Act provides that a selling agent will take subject to a security interest created by the seller if the selling agent receives notice of the lender's security interest within one year before the sale. Ocilla received the above notice of Bank's security interest in Debtor's cotton in July 1994, approximately eight months before the sale to Shekinah. Therefore, Ocilla is subject to Bank's security interest. 7 U.S.C. § 1631(g)(2)(A). However, this convenient conclusion does not end the Court's analysis.

Ocilla warehoused Debtor's cotton and issued warehouse receipts evidencing Debtor's cotton. "A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or ... labor ... in relation to the goods." O.C.G.A. § 11–7–209(1) (1994). This is a specific, possessory lien on the bailor's goods to cover enumerated charges and expenses arising out of the storage transaction. *Western Servs. Corp. v. Marlow (In re Julien Co.)*, 136 B.R. 743, 752–53 (Bankr.W.D.Tenn.1991). These charges and expenses have already been found to cover the costs of ginning and storing cotton. *See id.* at 753. In addition, cotton cannot be ginned and stored if it remains in the field. Therefore, Debtor's lien, as a warehouseman, on Debtor's cotton covered by the warehouse receipts must extend, as part of the storage transaction, to the cost of picking Debtor's cotton from the field so that it could be transferred to Ocilla's facilities where it was ginned and then stored. Ocilla maintained possession of the

5. Though Ocilla was not listed as a seller in the contract, Ocilla was the only entity Shekinah had any direct contact with. Ocilla contacted Shekinah, arranged the sale, collected and forwarded the sales contract, and delivered the cotton to

Shekinah. Therefore, this Court finds that both Debtor and Ocilla acted as seller here, and it was thus proper for Shekinah to deliver the proceeds to Ocilla.

cotton until after it had offset these costs against the proceeds from the transfer of the warehouse receipts to Shekinah thereby maintaining its possessory lien.

The above analysis shows that Ocilla had a security interest effective against Debtor. However, the Court further finds that Bank authorized the creation of this interest and in doing so lost its security interest in the cotton and the proceeds from the sale of the cotton to the extent necessary to satisfy Ocilla's lien.

A secured party loses its security interest in collateral when it authorizes, in the security agreement or otherwise, the sale, exchange, or other disposition of the collateral. O.C.G.A. § 11–9–306(2) (1994). "Sale" is defined in Georgia's version of the U.C.C. as "the passing of title from the seller to the buyer for a price." *Id.* § 11–2–106(1). "Exchange" and "other disposition" are not defined in the U.C.C. However, in another case decided in this district, *Tidwell v. Slocumb (In re Georgia Steel, Inc.),* 71 B.R. 903, 910 (Bankr.M.D.Ga.1987)), the court noted that "an 'exchange occurs when one party passes his property to another and in turn receives from the latter his property without having an agreed value placed on [either].'" (Quoting *Weisbart & Co. v. First Nat'l Bank,* 568 F.2d 391, 395 (5th Cir.1978). Applying the canon of statutory construction, ejusdem generis,[6] the court found as follows:

> "other disposition" refer[s] to a transaction of the same general type as a sale or exchange. Therefore, though "other disposition" cannot technically be characterized as a sale or exchange, at the minimum it must meet the threshold test of these two transactions by effecting a transfer of property. *See Barnard v. Barnard,* 91 Ga.App. 502, 502–503, 86 S.E.2d 533, 536 (1955) (holding that since the word "sell" means to "divest one's self of all rights and interest in a thing sold," the doctrine of ejusdem generis compels that "exchange" and "dispose" also carry that connotation).

*Tidwell,* 71 B.R. at 910 (quoting *Weisbart,* 568 F.2d at 395).

---

**6.** Ejusdem generis provides that "words following an enumeration of particular or specific items should be construed to fall into the same

The Court finds that a disposition of a portion of Bank's collateral occurred when Debtor stored the cotton with Ocilla. A contract for the sale of Debtor's cotton had already been entered into with Shekinah. Debtor and Ocilla understood that Ocilla would be paid for the cost of picking, ginning, and storing Debtor's cotton from the proceeds of this sale. Therefore, when Debtor allowed Ocilla to pick, gin, and store its cotton, Debtor was divesting itself of its right to that portion of the cotton, or its proceeds, necessary to cover Ocilla's costs. Further, the Court finds that Bank authorized this disposition as evidenced by the notice it sent to Shekinah. The notice identified Ocilla as a potential selling agent of Debtor's cotton. Bank understood the nature of this transaction—in order for the cotton to be of any value as collateral it must be picked and ginned so that it could be sold, and it would have to be stored while the sale was pending. Bank understood that Ocilla would provide these services and would need to be compensated for having done so. The notice indicates Bank's intent to authorize Debtor to dispose of that portion of cotton, or its proceeds, necessary to cover Ocilla's costs for these services.

Therefore, Bank gave up its prior-perfected security interest in the cotton and its proceeds to the extent necessary to cover Ocilla's charges and expenses generated in picking, ginning, and storing Debtor's cotton. Because Ocilla's charges exceeded the proceeds from the sale of Debtor's cotton, Ocilla was entitled to use the entire $5,784.75 to offset these charges.

### *Setoff: 11 U.S.C. § 553(b)*

Having found that both Shekinah and Ocilla were entitled to offset their claims against the sale price for the 106 bales of cotton, the Court now turns its attention to Movant's alternative claim that the exercise of these rights constituted avoidable setoff preferences under section 553(b) of the Bankruptcy Code.

---

class as those items specifically named." *Weisbart,* 568 F.2d at 395 n. 6.

Section 553 recognizes a party's right to setoff where (1) the creditor has a prepetition claim against the debtor, (2) the creditor owes a prepetition debt to the debtor, (3) the claim and debt are owed between the same parties, and (4) the claim and debt are valid and enforceable. 11 U.S.C. § 553(a) (1988). However, section 553(b) permits a trustee/debtor-in-possession to recover prepetition setoffs that occur within ninety days before the debtor files a bankruptcy petition to the extent the creditor improves its position as a result of the setoff. *Id.* § 553(b). The amount that may be recovered is calculated by subtracting the insufficiency—amount that the creditor's claim against the debtor exceeds the amount of debt owed to the debtor—that exists at the time of setoff from the insufficiency that exists on the later of (a) ninety days before the filing of the petition, or if there is no insufficiency at that time, (b) the first date during the ninety-day period before filing the petition that an insufficiency exists. *Id* . § 553(b)(1)(A)-(B). The reason for this provision is to eliminate a creditor's prepetition temptation to setoff a debt owed to an insolvent debtor by allowing the debtor-in-possession to recover the value of the improvement in the creditor's position gained by the setoff. 5 KING, COLLIER ON BANKRUPTCY, ¶ 553.09[2], p. 553–92 (15th ed.1995).

As previously noted, Shekinah's right to deduct its losses from the price of the 106 bales of cotton was a recoupment rather than a setoff. A recoupment is distinguished from a setoff as follows: The defendant's right to recoupment exists in a claim it has against the plaintiff that arises out of the same transaction as the plaintiff's claim against the defendant; whereas a defendant's right to setoff exists as a result of a claim it has against the plaintiff that arises in a separate cause of action against the plaintiff. *See In re Smith,* 737 F.2d 1549, 1552 n. 7–8 (11th Cir.1984). Movant's claim against Shekinah arose from Debtor's delivery of 106 bales of cotton under the contract. Shekinah's claim results from Debtor's failure to fully perform his obligations under that very same contract. As section 553(b) only applies to the right of setoff, Shekinah's exercise of its right of recoupment is not affected by that provision.

Ocilla's use of the proceeds from the sale, however, was a setoff. Ocilla's claim against Debtor is to recover the value of services provided to Debtor in preparing Debtor's cotton for sale. This claim is extrinsic to Debtor's claim seeking recovery of alleged converted funds due from the sale transaction. This setoff falls within the provisions of section 553. Ocilla had a prepetition claim against Debtor for the costs it incurred in picking, ginning, and storing Debtor's cotton. Ocilla owed a prepetition debt to Debtor for the value of Debtor's cotton that Ocilla held in storage.

In applying section 553(b), the Court finds that there was never any time during the ninety days before Debtor filed his petition that Ocilla would have recovered less than it did on the date of setoff. Prior to the date of sale to Shekinah, the value of Debtor's cotton was greater than the total charges Ocilla had incurred in picking, ginning, and storing Debtor's cotton. It was not until Shekinah exercised its right of recoupment that the value of Debtor's cotton was effectively reduced to a value less than the charges owed to Ocilla. This was the first occurrence of an insufficiency. That value remained the same up to the date of the prepetition setoff. Therefore, the amount of insufficiency never decreased, Ocilla never improved its position, and, as a result, there is no preference for the Court to avoid under section 553(b).