## M & I MARSHALL & ILSLEY BANK, Respondent,

v.

## KINDER MORGAN OPERATING L.P. "C," et al., Appellants.

### No. ED 96761.

Missouri Court of Appeals, Eastern District, Division One.

Feb. 7, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 19, 2012.

Application for Transfer Denied July 3, 2012.

Booker T. Shaw, Stephen A. D'Aunoy, St. Louis, MO, Patricia W. Prewitt, Navasota, TX, for appellants.

Clark H. Cole, Sara F. Melly, St. Louis, MO, for respondent.

GARY M. GAERTNER, JR., Judge.

In this case, we are asked to determine the priority between a warehouse lien and a perfected security interest. Kinder Morgan Operating L.P. "C" (KMO) and Kinder Morgan Amory, L.L.C. (KM Amory) (collectively, Kinder Morgan) appeal the trial court's grant of partial summary judgment granting M & I Marshall & Ilsley Bank's (M & I) perfected security interest priority over Kinder Morgan's two warehouse liens. Applying the Uniform Commercial Code (UCC),[1] we conclude that under the facts presented here, the 2006 warehouse lien has priority over the 2007 perfected security interest, which in turn has priority over the 2008 warehouse lien. Affirmed in part, and reversed and remanded in part.

## Background

Kinder Morgan operates facilities, referred to as terminals, for the storage and transportation of various products. KMO is located in Arkansas, and KM Amory is located in Mississippi. Jomico L.L.C. (Jomico) is a distributor[2] of coal with headquarters in St. Louis, Missouri. On

---

**1.** The parties on appeal argue priority within the rubric of the UCC, which Missouri has adopted. Sections 400.7–101, RSMo. (2000), 400.9–101, RSMo. (2001). For clarity and consistency, we do so as well. Article 7 of the UCC was last revised in 2003. Although Missouri has not yet adopted the most current version of Article 7, we cite to the UCC because the 2003 changes are not substantive and do not affect our analysis. As relevant to this appeal, prior U.C.C. § 7–209(3) (1966)

directed the reader to U.C.C. § 7–503 (1999), but current U.C.C. § 7–209(c) (2003) incorporates the language of U.C.C. § 7–503 (2003). We note that Missouri is one of the few remaining states that has not yet adopted the revised UCC.

**2.** Jomico does not extract coal from the ground, but purchases coal and related commodities from producers that have completed the extraction.

January 11, 2006, KMO and Jomico entered into a terminal agreement (KMO Terminal Agreement), which provides as follows. KMO agreed to provide storage and handling for Jomico's coal and coal products at KMO's Arkansas terminal, for a fee of $67,083 per month through April 30, 2016. In the section entitled "Liens," the KMO Terminal Agreement states:

> At all times to the extent permitted by law, [KMO] shall have all applicable statutory liens upon all [coal] at any time in the Terminal for the charges set forth herein whether incident to [coal] then on the Terminal or otherwise and in connection with any and all other agreements between [KMO] and [Jomico]. . . .

The KMO Terminal Agreement anticipated that Jomico would begin depositing coal on or about May 1, 2006. Todd Jones, Commercial Director for both KMO and KM Amory warehouses, attested that as of September 1, 2010, Kinder Morgan had been providing processing, storage, and transportation services to Jomico for four years.[3]

On June 4, 2007, Jomico entered into a commercial security agreement (Security Agreement) with M & I,[4] granting M & I a security interest in its collateral—described as, inter alia, all inventory, equipment, accounts, and money—to secure a bank loan. The Security Agreement provides as follows, in relevant part:

> **Location of the Collateral** Except in the ordinary course of Grantor's [Jomico's] business, Grantor agrees to keep the Collateral . . . at Grantor's address [on Washington Avenue] or at such other locations as are acceptable to Lender [M & I]. Upon Lender's request, Grantor will deliver to Lender . . . a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following . . . (3) all storage facilities Grantor owns, rents, leases, or uses, and (4) all other properties where Collateral is or may be located.

> **Removal of Collateral** Except in the ordinary course of Grantor's business, including the sale of inventory, Grantor shall not remove the Collateral from its existing location without Lendor's prior written consent. . . .

> **Transactions involving Collateral** Except for inventory sold or accounts collected in the ordinary course of Grantor's business . . . , Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. . . .

> **Title** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free

---

**3.** M & I filed a motion to strike this statement. In the absence of any record to the contrary, we will deem this motion denied.

**4.** The Security Agreement was between Jomico and Southwest Bank of St. Louis, which M & I acquired on or about July 1, 2010. For clarity, we will substitute the name of M & I for Southwest Bank even for actions that occurred before M & I acquired Southwest Bank.

and clear of all liens and encumbrances. . . .

. . .

**Taxes, Assessments and Liens** Grantor will pay when due all taxes, assessments and liens upon the Collateral. . . . Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lenders' sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien . . . that could accrue as a result of foreclosure or sale of the Collateral.

. . .

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS** . . . Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement. . . .

On June 18, 2007, M & I filed a UCC Financing Statement with the Missouri Secretary of State identifying Jomico as the debtor and substantially describing Jomico's personal property, including, without limitation, all current and after-acquired inventory.

On February 15, 2008, KM Amory and Jomico entered into a terminal agreement (KM Amory Terminal Agreement), whereby KM Amory agreed to provide storage, handling, and processing for Jomico's coal

and coal products in their Mississippi terminal,[5] for a fee of $178,750 per month for the first two years and $294,938 per month for the next eight years. Similar to the KMO Terminal Agreement, the KM Amory Terminal Agreement also provides that "[a]t all times to the extent permitted by law, [KM Amory] shall have all applicable statutory . . . liens upon all [coal] at any time in the Terminal for the charges set forth herein whether incident to [coal] then in or on the Terminal or otherwise and in connection with any and all other agreements between [KM Amory] and [Jomico]. . . ."

Jomico defaulted on the Security Agreement with M & I, and failed to make payments to both KMO and KM Amory under the respective terminal agreements. On or about February 2010, KMO was storing over 6,000 tons of coal and coal products in their Arkansas terminal, and KM Amory was storing over 2,300 tons of coal and coal products in their Mississippi terminal.

Kinder Morgan asserted warehouse liens against the coal, and stated its intent to sell the coal to cover the warehouse costs. M & I filed the underlying petition for declaratory judgment, contending it had a perfected security interest in the coal with priority over Kinder Morgan's warehouse liens, and objecting to the proposed sale. Both M & I and Kinder Morgan filed motions for summary judgment. The trial court granted partial summary judgment to M & I, finding that M & I's perfected security interest had priority over Kinder Morgan's warehouse liens. This appeal follows.

*Standard of Review*

We review a trial court's grant of summary judgment de novo. *ITT Commercial*

---

5. The $6,500,000 facility in Mississippi was built pursuant to an October 2007 construc-

tion contract between Jomico and KM Amory

*Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is appropriate where the moving party demonstrates a right to judgment as a matter of law based on facts about which there is no genuine issue of material fact. *Id.* at 378. A genuine issue exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *Id.* at 382. When considering an appeal from summary judgment, we view the record in the light most favorable to the party against whom judgment was entered, and we afford the non-movant the benefit of all reasonable inferences from the record. *Cardinal Partners, L.L.C. v. Desco Inv. Co.*, 301 S.W.3d 104, 108–09 (Mo.App. E.D.2010).

## Discussion

### Point I

In its first point on appeal, Kinder Morgan argues that the trial court erred in finding that its warehouse lien did not have priority over M & I's perfected security interest, in that the trial court incorrectly determined the perfected security interest predated the warehouse liens. We agree in part and disagree in part.

In support for Point I, Kinder Morgan contends that its 2006 KMO Terminal Agreement predates the 2007 M & I Security Agreement, and that under U.C.C. § 7–209, any coal deposited after the loan can be used to secure unpaid charges incurred before the loan, even if the coal had already been delivered. U.C.C. § 7–209(a) (2003); *see also* Section 400.7–209(1), RSMo. (2000). Kinder Morgan's argument presumes that the 2006 charges incurred at KMO in Arkansas can be secured by the coal stored at KM Amory in Mississippi. In response, M & I asserts that Kinder Morgan admitted to having delivered the coal deposited in 2006 and replacing it with coal after June 18, 2007, the date of the UCC filing statement that perfected M & I's interest. Because the UCC gives priority only to goods in the warehouse's possession at the time the security interest is perfected, the coal here, which was delivered after June 18, would not have priority over M & I's secured interest.

 Despite Kinder Morgan's apparent assumption, we do not view the 2006 warehouse lien between Jomico and KMO, and the 2008 warehouse lien between Jomico and KM Amory as a single warehouse lien. A warehouse lien is only available on goods for which a valid warehouse receipt has been issued. *In re Siena Publishers Assocs.*, 149 B.R. 359, 362 (Bankr.S.D.N.Y. 1993). While a warehouse receipt need not be in any particular form, it must contain certain essential terms, such as the location of the warehouse where the goods are stored, the date of the receipt, and the rate of storage. U.C.C. § 7–202 (2003); *see also.* Section 400.7–202, RSMo. (2000); *Siena Publishers,* 149 B.R. at 362–63.

 Here, the terminal agreements list the warehouse locations, the dates of the agreements, and the rates of storage, and thus constitute valid warehouse receipts. KMO is a Delaware limited partnership, while KM Amory is a Mississippi limited liability company, and thus they are separate legal entities. Further, the two receipts reflect different warehouse locations, were entered into on different dates, and charged different rates, and thus the KMO Terminal Agreement cannot serve as a warehouse receipt for the KM Amory warehouse, and vice versa. Moreover, the KM Amory warehouse had not even been built at the time of the KMO Terminal Agreement. A valid warehouse receipt is a condition precedent for a warehouse lien. *Siena Publishers,* 149 B.R. at 362. Because the KMO Terminal Agreement is

not a valid receipt with respect to goods stored in the KM Amory warehouse, the KMO Terminal Agreement does not create a warehouse lien upon those goods.[6]

Accordingly, our priority determinations are twofold: the 2006 KMO Terminal Agreement versus the Security Agreement, and the 2008 KM Amory Terminal Agreement versus the Security Agreement.

U.C.C. § 7–209 creates and defines a warehouse lien, and governs the order of priority between a warehouse lien and the rights of third parties, including persons holding a perfected security interest. Specifically, it provides as follows:

(a) A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement ... for charges for storage or transportation ... in relation to the goods.... If the person on whose account the goods are held is liable for similar charges or expenses in relation to other goods whenever deposited and it is stated in the warehouse receipt or storage agreement that a lien is claimed for charges and expenses in relation to other goods, the warehouse also has a lien against the goods covered by the warehouse receipt or storage agreement ... for those charges and expenses, whether or not the other goods have been delivered by the warehouse.

...

(c) A warehouse's lien for charges and expenses under subsection (a) ... is also effective against any person that so entrusted the bailor with possession of the goods that a pledge of them by the bailor to a good-faith purchaser for value would have been valid. However, the lien ... is not effective against a person that before issuance of a document of title had a legal interest or a perfected security interest in the goods and that did not:

(1) deliver or entrust the goods ... to the bailor ... with:

(A) actual or apparent authority to ship, store, or sell;

...

(2) acquiesce in the procurement by the bailor or its nominee of any document.

...

(e) A warehouse loses its lien in any goods that it voluntarily delivers....

See also Sections 400.7–209, RSMo. (2000), 400.7–503, RSMo. (2001). We apply U.C.C. § 7–209 to the two priority determinations as follows.

### Priority between the 2006 KMO Terminal Agreement and M & I's Security Agreement

Under the plain language of the UCC, a warehouse lien is valid against the bailor (here, Jomico). U.C.C. § 7–209(a). With regards to a claim on the stored goods by a third party, however, the law is less clear. Several UCC provisions provide guidance. In general, U.C.C. § 9–322(a)(1) provides that conflicting perfected security interests rank according to priority in time of filing. U.C.C. § 9–322(a)(1) (2003); see also Section 400.9–322(a)(1), RSMo. (2001). U.C.C. § 9–333, however, provides that possessory, statutory liens—such as a warehouse lien—will have "priority over a security interest in the goods, unless the lien is created by a statute that *expressly provides otherwise.*"

---

**6.** We note that although the 2006 KMO Terminal Agreement's language claims a lien upon all coal "then on the Terminal or otherwise and in connection with any and all other agreements between Kinder Morgan and [Jomico]," "Kinder Morgan" had earlier in the agreement been defined specifically as KMO, not the parent company.

(emphasis added) U.C.C. § 9–333 (2003); *see also* Section 400.9–333, RSMo. (2001). Because U.C.C. § 7–209 sets forth circumstances under which a warehouse lien will not take priority over a secured party, U.C.C. § 7–209 "expressly provides otherwise" within the meaning of U.C.C. § 9–333. *In re Sharon Steel Corp.*, 176 B.R. 384, 387–88 (Bankr.W.D.Pa.1995); *Curry Grain Storage, Inc. v. Hesston Corp.*, 120 Idaho 328, 815 P.2d 1068, 1071 (1991).

U.C.C. § 7–209 provides that a prior warehouse lien takes priority over subsequent claims upon the goods. The UCC's Official Comment explains that when a bailor grants a security interest in goods to a secured party while the goods are in the warehouse's possession, the warehouse lien takes priority. U.C.C. § 7–209 cmt. 3, example 8 (2005); *Bracey v. Monsanto Co.*, 823 S.W.2d 946, 950 (Mo. banc 1992) (parties may look to UCC Official Comments for guidance). Thus, our first question is whether the coal was in possession of the KMO terminal before M & I perfected its Security Agreement.

■ Warehouse liens are possessory, and delivery of the stored goods may cause a warehouse to lose its lien. U.C.C. § 7–209(a), (e); 7 Hawkland's Uniform Commercial Code Series § 7–209:2 Types of Liens (Supp.2011). M & I seeks to distinguish the coal that was deposited between 2006 and June 18, 2007, from the coal that was deposited after June 18, 2007 (the date upon which M & I argues it would gain priority in time). M & I further claims that when Kinder Morgan agreed in its answer to M & I's initial petition that "coal was deposited into the KMO terminal after June 18, 2007," this constituted an admission either that the coal deposited between 2006 and June 18, 2007, had been delivered within the meaning of U.C.C. § 7–209(e), or that coal deposited after June 18 could be distinguished from coal deposited before June 18. The trial court agreed with M & I that the coal at issue in this suit was "limited to that coal delivered to [KMO's] warehouse after the filing of [M & I's] financing statement [on June 18, 2007]," and the coal delivered after June 18, 2007, was not first in time for priority purposes. We disagree.

The record shows that KMO provided warehouse services for Jomico's coal on an ongoing basis from 2006. KMO stored Jomico's coal in one-ton super sacks, silos, and piles. Coal is a fungible good, and coal stored in silos and piles would necessarily become intermingled. *See In re Wyoming Valley Collieries Co.*, 29 F.Supp. 106, 109 (M.D.Pa.1939) (coal is fungible good). There is nothing in the record demonstrating that KMO stored the coal it received separately, or that it would be possible to identify the particular coal delivered before June 18, 2007, from that delivered after. Black's Law Dictionary 684 (7th ed.1999) (fungible means commercially interchangeable with other property of same kind). On its face, we do not agree that Kinder Morgan's admission that *some* coal was deposited after June 18, 2007, can be read as an admission that all coal deposited between 2006 and June 18, 2007, had been delivered and was no longer in KMO's possession. Without such an admission, this Court has no way to determine whether any coal deposited before June 18, 2007, remains in KMO's warehouse. Because the record does not definitively support the trial court's interpretation of this material fact, summary judgment was improper in this regard. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 378, 382.

Even if the record did show that KMO had entirely replaced the coal deposited before June 18, 2007, with coal deposited after June 18, 2007, if the 2006 KMO Terminal Agreement created a "general" lien,

then any coal deposited after June 18, 2007, was also subject to that warehouse lien. Under the UCC, a "specific" lien attaches automatically to the specific goods stored under the receipt or storage agreement. However, a warehouse may assert a "general" lien (sometimes referred to as a "spreading" lien) "for similar charges or expenses in relation to other goods whenever deposited . . . whether or not the other goods have been delivered by the warehouse."[7] U.C.C. § 7–209(a) & cmt. 1, para. 3; *In re Julien Co.*, 136 B.R. 743, 751 (Bankr.W.D.Tenn.1992) ("spreading lien"). The language of the UCC explicitly contemplates a situation where, as here, the warehouse lien may be secured by goods currently held for charges incurred for goods that have already been delivered.

To create a general lien, (1) the bailor must be liable for storage charges in relation to goods other than those at issue in the receipt, and (2) the receipt or storage agreement must state that the lien is claimed for charges in relation to those other goods. U.C.C. § 7–209(a); *cf. Harbor View Marine Corp. v. Braudy*, 189 F.2d 481, 485 (1st Cir.1951) (in cases of non-negotiable receipts, customer may withdraw part of goods from warehouse without paying charges, so long as warehouse retains other goods of customer to serve as security for debt on general account); *Robinson v. Larrabee*, 63 Me. 116, 117 (Maine 1873) ("[t]here is no question but the voluntary relinquishment, by the bailee, of possession of the subject of the bailment discharges his lien, unless it is consistent with the contract, the course of business or the intention of the parties").[8]

Applying this two-part test here, first, Jomico is liable for storage charges for all coal deposited with KMO, not simply the first deposit of coal following the KMO Terminal Agreement. Second, the language of the ten-year KMO Terminal Agreement states: KMO "shall have . . . liens upon all Commodities at any time in the Terminal for the charges set forth herein whether incident to Commodities then on the Terminal or otherwise." While it would be preferable if KMO had included the specific UCC language, "in relation to other goods," *see In re Julien Co.*, 136 B.R. 765, 774 (Bankr.W.D.Tenn. 1992), what matters is that the language in the warehouse lien shows that the lien claimed was for storage of goods other than those described on the receipt. *Cf. Matter of Celotex Corp.*, 134 B.R. 993, 997–98 (Bankr.M.D.Fla.1991) (although warehouse claimed general lien, warehouse receipt did "not specify a lien for charges for storage of goods not covered by the service bills"). We find that the language used here, "whether incident to Commodities then on the Terminal or otherwise," sufficiently claims a general lien for the storage costs incurred for all coal deposited with KMO, and thus complies with the elements set forth in U.C.C. § 7–209(a).

The 2006 KMO Terminal Agreement was first in time before the 2007 Security Agreement. The trial court's finding that it was possible to differentiate between coal deposited before and after June 18,

---

7. U.C.C. § 7–209(a) provides in full:

If the person on whose account the goods are held is liable for similar charges or expenses in relation to other goods whenever deposited and it is stated in the warehouse receipt or storage agreement that a lien is claimed for charges and expenses in relation to other goods, the warehouse also has a lien against the goods covered by the warehouse receipt or storage agreement . . . for those charges and expenses, whether or not the other goods have been delivered by the warehouse.

8. Courts may look to pre-UCC caselaw where the statutory provisions relied on therein are not inconsistent with the UCC. U.C.C. § 1–103(b) & cmt. 2 (2003).

2007, is not supported by the record; further, the trial court failed to recognize that charges accrued for coal deposited and delivered between 2006 and June 18, 2007, could be and in fact were secured by a general lien against coal deposited after June 18. Therefore, the 2006 warehouse lien takes priority over M & I's perfected security interest.

This portion of Point I is granted.

*Priority between 2008 KMO Terminal Agreement and M & I's Security Agreement*

■ A prior secured party takes priority over a subsequent warehouse lien upon the goods. U.C.C. § 7–209 cmt. 3, example 10 (when bailor grants perfected security interest in goods to secured party prior to storage of goods with warehouse, then subsequent warehouse lien is not effective against secured party, subject to exceptions); U.C.C. § 9–322(a)(1) (conflicting perfected security interests rank according to priority in time of filing); *Curry Grain,* 815 P.2d at 1071 (because conflicting security interests rank according to priority in time of filing or perfection, and because bank perfected its interest in goods before goods were deposited with warehouse, bank's security interest has priority). Here, the 2007 perfected security interest was prior in time to the 2008 KM Amory Terminal Agreement, and thus takes priority, subject to our analysis in response to Points II and III. This portion of Point I is denied.

Point I granted in part and denied in part.

*Points II and III*

In its second and third points on appeal, Kinder Morgan argues the trial court

erred in finding that its warehouse liens did not have priority over M & I's perfected security interest, in that M & I entrusted Jomico, the bailor, with the coal for purposes of U.C.C. § 7–209 and its relevant Official Comments. Regarding entrustment, Kinder Morgan further contends the trial court erroneously failed to consider U.C.C. § 2–403 (2003), which defines "entrusting." We address points II and III together.[9]

Warehouse liens are effective against another person who "so entrusted" the goods to the bailor. U.C.C. § 7–209(c). Entrustment is a murky concept. The code provides two analyses for entrustment: the positive ("[a] warehouse lien . . . is also effective against any person that so entrusted the bailor with possession of the goods that a pledge of them by the bailor to a good-faith purchaser for value would have been valid") and the negative ("the [warehouse] lien . . . is not effective against a person that before issuance of a document of title had a legal interest or a perfected security interest in the goods and that did not: (1) deliver or entrust the goods . . . to the bailor . . . with: (A) actual or apparent authority to ship, store, or sell" the goods). U.C.C. § 7–209(c).

In both the positive and the negative analyses, the essential issue is whether the third person claiming an interest in the goods either (1) entrusted the goods or a document of title to the bailor such that the bailor could have validly transferred rights in those goods to another person, or (2) acquiesced in the bailor obtaining a document of title covering the goods.[10] 7 Hawkland's UCC Series § 7–209:4.

---

9. Because the 2006 KMO Terminal Agreement is first in time, whether M & I entrusted the coal to Jomico does not alter the result; we therefore limit our analysis to the 2008 KM Amory Terminal Agreement.

10. For purposes of this appeal, we will review entrustment focusing on the bailor's power to

*Actual or Apparent Authority
to Ship, Store, or Sell*

■ Kinder Morgan directs our attention primarily to the negative analysis, asserting that because M & I allowed Jomico to sell its coal in the ordinary course of business, M & I "entrust[ed]" the coal to Jomico with "actual or apparent authority to ship, store, or sell" within the meaning of U.C.C. § 7–209(c)'s priority-shifting paradigm. Kinder Morgan would have us expand the meaning of entrustment to include any situation in which a secured party allows the debtor/bailor any control over the goods, no matter how limited. This broad interpretation does not conform to either the language or the meaning of the code.

■ First, the code states, "the [warehouse] lien ... is *not* effective against a person that before issuance of a document of title had ... a perfected security interest in the goods...." U.C.C. § 7–209(c); *see also* Section 400.7–503, RSMo. The "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute." *Parktown Imports, Inc. v. Audi of America, Inc.,* 278 S.W.3d 670, 672 (Mo. banc 2009). The negative language here appears to reflect a legislative intent to limit the circumstances when a warehouse lien may take priority over an earlier perfected security interest. Second, to interpret the negative language broadly would make irrelevant the remainder of the section,[11] which provides a more limited interpretation of "entrust," focusing on a bailor's ability to pledge the goods. Such an effect is contrary to standard statutory construction. *Hargis v. JLB Corp.,* 357 S.W.3d 574, 587 (Mo. banc 2011) ("[e]ach word, clause, sentence and provision of a

statute is presumed to have meaning and effect").

Looking at the Security Agreement in full, we do not believe M & I entrusted the coal to Jomico. The Security Agreement states:

> Except for inventory sold ... in the ordinary course of Grantor's business ..., Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral.... Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or encumbrance. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.

Any person reading the language of the Security Agreement could not genuinely believe Jomico was free to dispose of the coal without limitation. *Centerre Bank Nat'l Ass'n v. Mo. Farmers Ass'n, Inc.,* 716 S.W.2d 336, 340 (Mo.App. E.D.1986) (consider how third party would reasonably understand loan agreement).

The Security Agreement allows sales in the ordinary course of business only to buyers who qualify as a buyer in the ordinary course of business, and it explicitly disallows the transfer of goods to satisfy a debt and the pledge of goods as security for a lien. Kinder Morgan asserts that it meets the definition of a buyer in the ordinary course of business. We disagree. A buyer in the ordinary course of business

---

transfer rights in the goods, rather than document of title, to another person.

**11.** *See also* Section 400.7–209(3), RSMo.

is defined as "[a] person who—in good faith and without knowledge that the sale violates a third party's ownership rights or security interest in the goods—buys from a person regularly engaged in the business of selling goods of that kind." Black's Law Dictionary 193 (7th ed.1999). As a warehouse, which stores but does not buy the relevant goods, KM Amory does not qualify as a buyer in the ordinary course of business.

Moreover, we do not find the allegation in M & I's petition for declaratory judgment that Jomico "owned and controlled" the coal was an admission that it had granted actual or apparent authority to Jomico to ship, store, or sell the coal in a manner that expressly violated the Security Agreement. The Security Agreement provides, "Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with the Agreement." Jomico was the owner of the coal, and they controlled it only within the limitations provided in the Security Agreement.

Under the negative analysis set forth in U.C.C. § 7–209(c), M & I did not entrust the coal to Jomico.

### Pledge of Goods by a Bailor to a Good–Faith Purchaser for Value would have been Valid

Courts have typically analyzed entrustment using the positive language in the first sentence of U.C.C. § 7–209(c), which provides that a warehouse lien takes priority over a person who so entrusted possession of the goods to the bailor, such that a pledge of the goods by the bailor to a good-faith purchaser for value would have been valid. A pledge is defined as a deposit of personal property to a creditor to secure a debt. Black's Law Dictionary 1175 (7th ed.1999); *see also Curry Grain*, 815 P.2d at 1071.

Mere acquiescence in allowing a warehouse possession of the goods is not sufficient to establish entrustment within the meaning of UCC Article 7. 7 Hawkland's UCC Series § 7–209:4; *see also Curry Grain*, 815 P.2d at 1069, 1072 (lender did not entrust goods to debtor even though loan agreement recognized that goods would be stored in warehouses, secured by warehouse receipts). Even further, courts have held that when a bank possesses a perfected security interest in all of the debtor's assets, including its inventory, a debtor may not validly pledge that inventory to another person. *Siena Publishers,* 149 B.R. at 364. This would suggest that entrustment is foreclosed in all cases where a lender did not explicitly allow the debtor/bailor to transfer rights in the goods, such as to secure a storage agreement. Entrustment can arise, however, where facts demonstrate more than mere acquiescence, such as granting permission to store the goods, *Sharon Steel,* 176 B.R. at 387–88, or engaging in direct dealings with the warehouse, *McDonald v. Ocilla Cotton Warehouse, Inc.,* 224 B.R. 862, 869 (Bankr.S.D. Georgia 1998); *see also* 7 Hawkland's UCC Series § 7–209:4.

Kinder Morgan relies mainly on *Sharon Steel,* in which the court gave a 1991 warehouse lien priority over a 1990 secured bank loan. 176 B.R. at 389. The court there found that by "permitting" the debtor to store goods at the warehouses and incur liens, the bank "effectively permitted the debtor to transfer its inventory to the pledgees ( [warehouses] ) as security for the pledgor's (Debtor) payment of the warehouseman's . . . liens." *Id.* In *Sharon Steel,* the bank's credit agreement explicitly stated that, as an exception to the overall ban on liens, "[l]iens arising by operation of law in favor of . . . warehousemen

... incurred by Holding ... in the Ordinary course of business which secure its obligations to such Person; provided, however, that (i) Holdings ... is not in default with respect to such payment obligation...." *Id.* at 385. Attached to the credit agreement in that case was Schedule II, which specifically listed the three relevant warehouses as known warehouse locations. *Id.* at 386.

*Sharon Steel* turned on the language of the credit agreement and the attachment. Unlike in *Sharon Steel*, the Security Agreement between M & I and Jomico does not allow for warehouse liens in the ordinary course of business. Rather, the Security Agreement articulates that "[Jomico] shall not pledge, mortgage, encumber or otherwise permit the [coal] to be subject to any lien ... without the prior written consent of [M & I]." More importantly, the Security Agreement does not include a schedule listing Kinder Morgan as a known warehouseman. Kinder Morgan asserts that the Security Agreement's requirement that Jomico "pay when due all ... liens" upon the collateral, provides implicit permission for Jomico to enter into warehouse liens. We do not agree. Because the Security Agreement elsewhere allows Jomico to enter into liens with M & I's permission, the requirement that Jomico timely pay its liens cannot be read as allowing Jomico to enter into unauthorized warehouse liens. We do not interpret the Security Agreement as explicitly or implicitly giving Jomico permission to pledge its inventory to KM Amory as a bona-fide purchaser for value, namely as security for

payment of the warehouse liens. U.C.C. § 7–209(c).

Rather, we find more instructive *Curry Grain*,[12] which stands for the proposition that when a lender merely allows goods to be transferred to a warehouse for storage, this does not constitute the type of entrustment envisioned in U.C.C. § 7–209(c). 815 P.2d at 1069. In *Curry Grain*, the lender's (Hesston's) perfected security interest, secured by the debtor's grass seed, pre-existed the debtor's deposit of the same grass seed into Curry Grain Storage's warehouse; thus, Hesston's interest took priority. *Id.* at 1068–69, 1071. Accordingly, the court noted that the question was "whether Hesston so entrusted [the debtor] with possession of the seed that a pledge of the seed to a hypothetical bona fide pledgee would have given the pledgee priority over Hesston." *Id.* at 1071. The court, while not providing an extensive analysis, answered this question in the negative by way of its conclusion that Hesston's security interest had priority over the warehouse lien. *Id.* at 1071–72.

The facts of *Curry Grain* showed that Hesston was aware that the debtor's practice was to store the grass seed in warehouses, which they recognized in their loan agreement by requiring the debtor to obtain warehouse receipts. *Id.* at 1068–69. Yet, the court's ruling held that this general recognition of storage alone did not constitute entrustment. *Id.* at 1072. Similar to grass seed, coal must be stored somewhere, and, like Hesston, M & I must have been aware of the likelihood that the coal would be stored in a warehouse. M &

---

**12.** Although Kinder Morgan asserts in its reply brief that *Curry Grain* "has never been followed by another court," we note its favorable discussion in *In re Siena Publishers Assocs.*, 149 B.R. 359 (Bankr.S.D.N.Y.1993), and *In re Sharon Steel*, 176 B.R. 384 (Bankr. W.D.Penn, 1995), as well as in numerous

secondary sources. Further, its relevant legal analysis was not overruled by a change in Idaho state law, which granted *agricultural commodity* warehouse liens a priority over secured interests. *Ag Servs. of Am., Inc. v. Kechter*, 137 Idaho 62, 44 P.3d 1117, 1121 (2002).

I's Security Agreement requests a list of locations where Jomico stored its inventory, but the record does not show that Jomico ever provided such a list. Rather, M & I asserts they were unaware that Jomico was storing coal with Kinder Morgan's warehouses. Kinder Morgan, unsurprisingly, disputes this claim, but it points to nothing in the record establishing actual knowledge.

The trial court here relied on *Siena Publishers* for the proposition that Jomico could not validly pledge its coal to KM Amory, because M & I possessed a perfected security interest in all of the coal. 149 B.R. at 364. The trial court noted that the terms of the Security Agreement delineate the scope of Jomico's valid actions with regard to pledgees, and those terms articulate that Jomico "shall not pledge . . . the Collateral to be subject to any lien." In the absence of any recognition by M & I of its knowledge that Jomico was storing its coal with Kinder Morgan, we cannot say that M & I entrusted Jomico with possession of the coal such that it had the power to create a valid pledge of the inventory. Without the power to create a valid pledge, a subsequent warehouse lien would not have priority.

Kinder Morgan argues that *Siena Publishers* will shortly be overruled by a change in New York state law. The referenced change has not been approved or adopted in New York; thus, as of the date of this opinion, *Siena Publishers* is still good law. *City of Wellston v. SBC Commc'ns, Inc.*, 203 S.W.3d 189, 192 (Mo. banc 2006) ("court must enforce statutes as written"). We see no error in the trial

court's reliance on *Siena Publishers*. Moreover, we are unpersuaded by Kinder Morgan's reliance on any potential changes to U.C.C. § 7–209 that were not adopted, and thus not incorporated into Missouri statutes. *Id.* at 192 n. 6 ("Courts have no right, by construction, to substitute their ideas of legislative intent for that unmistakably . . . expressed in legislative words") (quoting *Clark v. Kansas City, St. L & C.R. Co.*, 219 Mo. 524, 118 S.W. 40, 44 (1909)).

■■■ Last, Kinder Morgan contends that the trial court erroneously failed to apply the definition of entrusting as set forth in U.C.C. § 2–403 and its Official Comment. We disagree. This section of the UCC expressly provides that "the rights of . . . lien creditors are governed by Articles 7 and 9." U.C.C. § 2–403(4); *see also* Section 400.2–403(4), RSMo. (2000). Again, the rules of statutory construction do not allow us to substitute our judgment for the express language of the statutes. The remainder of Kinder Morgan's allegations of error in points two and three are unavailing.[13]

Points II and III denied.

*Point IV*

■■■ In its fourth point on appeal, Kinder Morgan argues the trial court erred in finding Kinder Morgan's warehouse liens did not have priority over M & I's perfected security interest, in that M & I benefited from Kinder Morgan storing, improving, and preserving the bank's collateral. We disagree.

---

13. Contrary to Kinder Morgan's assertions on appeal, Example 10 in the Official Comments on its face is consistent with our analysis. Further, any error by the trial court in relying on Example 9 rather than Example 10 is harmless. Not every error mandates reversal. *See D.R. Sherry Constr., Ltd. v. Am. Family*

*Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. banc 2010). Prejudicial error is an error that materially affects the merits and outcome of the case. *Id.* Our analysis shows that M & I did not entrust the coal to Jomico, and this analysis is not affected by the application of Examples 9 or 10.

Kinder Morgan's argument in equity asserting that "a lender whose collateral is improved and protected . . . should have to pay for the preservation and improvement of his collateral," is unavailing. The priority between a warehouse lien and the interest of a secured lender is explicitly addressed by the UCC and incorporated into Missouri statutes, and we decline to substitute our judgment for that of the legislature's. *Clark,* 118 S.W. at 44 ("Courts have no right, by construction, to substitute their ideas of legislative intent for that unmistakably . . . expressed in legislative words").

While we agree that a lender should be estopped from knowingly allowing the debtor/bailor to place the goods in storage, thus running up storage charges, that is not the situation here. *McDonald,* 224 B.R. at 869; White & Summers' Unif. Comm.Code § 28–7 (5th ed. Supp.2011). Nothing in the record demonstrates that M & I had actual knowledge Jomico had agreed to a warehouse lien with KM Amory, especially as the Security Agreement expressly prohibits Jomico from entering into unsanctioned liens. *See Sharon Steel,* 176 B.R. at 389; *McDonald,* 224 B.R. at 869. As the facts stand, however, the trial court did not err in granting M & I priority over KM Amory's warehouse lien.

Point IV denied.

### Conclusion

The 2006 KMO Terminal Agreement was prior in time to M & I's Security Agreement and thus takes priority under U.C.C. §§ 209(a) & 9–322(a)(1), and Sections 400.7–209(1) & 400.9–322(a)(1), RSMo. M & I's Security Agreement, however, was prior in time to the 2008 KM Amory Terminal Agreement. Moreover, M & I did not entrust the coal to Jomico within the meaning of U.C.C. § 7–209(c) and Sections 400.7–209(3), 400.7–503, RSMo., and thus M & I's Security Agreement takes priority over KM Amory's Terminal Agreement.

The judgment finding that M & I's Security Agreement takes priority over the 2006 KMO Terminal Agreement is reversed and the cause is remanded to the trial court to enter judgment finding that the 2006 KMO Terminal Agreement takes priority over the M & I Security Agreement. That portion of the judgment finding that M & I's Security Agreement takes priority over the 2008 KM Amory Terminal Agreement is affirmed.

CLIFFORD H. AHRENS, P.J., and ROY L. RICHTER, J., concur.